(No. 33447.—
EKCO PRODUCTS COMPANY, Appellee, *vs.* ROY F. CUMMINS, Director of Labor, Appellant.

*Opinion filed March 24, 1955.*

LATHAM CASTLE, Attorney General, of Springfield, (JOHN L. DAVIDSON, JR., WILLIAM C. WINES, RAYMOND S. SARNOW, and A. ZOLA GROVES, of counsel,) for appellant.

MAYER, MEYER, AUSTRIAN & PLATT, of Chicago, (LEO F. TIERNEY, EDMUND A. STEPHAN, HARRY ADELMAN, and FRANCIS W. COLLOPY, of counsel,) for appellee.

Mr. JUSTICE SCHAEFER delivered the opinion of the court:

In November of 1951, Minute Mop Company, which manufactured floor mops and other cleaning aids, sold its manufacturing equipment and certain other assets to Ekco Products Company. The Director of Labor held that Ekco Products Company had succeeded to "substantially all of the employing enterprises" of Minute Mop Company and was therefore affected by Minute Mop's unfavorable employment experience in determining its unemployment contribution rate. In a proceeding under the Administrative Review Act the superior court of Cook County reversed the decision of the Director. He appeals to this court under section 2205 of the Unemployment Compensation Act. Ill. Rev. Stat. 1953, chap. 48, par. 685.

The Unemployment Compensation Act provides for the accumulation of reserves during periods of employment to be used to pay benefits to workers during periods of unemployment. (Ill. Rev. Stat. 1953, chap. 48, par. 300.) To provide the funds to pay unemployment compensation

benefits, the statute imposes upon employers an obligation to pay a percentage of their pay rolls into the State unemployment trust fund. Contribution rates vary from .25 per cent to 2.7 per cent, depending upon the employment experience of the particular employer. Employers who have a history of unstable employment tend to have higher contribution rates, and those who have a history of stable employment tend to have lower contribution rates.

Section 1507 of the act (Ill. Rev. Stat. 1953, chap. 48, par. 577,) deals with the determination of the contribution rate when the business of one employer is sold to, or otherwise taken over, by another. The section provides that the employment experience of one employer is transferred to another employer whenever the latter "succeeds to substantially all of the employing enterprises" of the former. The contribution rate of the successor is then computed upon the combined employment experience of the predecessor and the successor.

The only question in this case is whether Ekco Products Company succeeded to "substantially all of the employing enterprises" of Minute Mop Company, within the meaning of that phrase as used in section 1507. The Director of Labor answered this question in the affirmative and revised Ekco's contribution rate for the year 1952 from 1.0 to 1.25 per cent. Without the unfavorable employment experience of Minute Mop, Ekco's contribution rate would have been 1 per cent.

The facts are not in controversy. Prior to November 19, 1951, Minute Mop Company manufactured and sold patented floor mops, dish mops, bathtub brushes and other cleaning aids, each of which contained, as a basic part, a cellulose sponge. The company also sold under an exclusive licensing arrangement, but did not manufacture, a device for removing bottle caps and resealing beverage bottles, known as "Recap." From January 1, 1951, to November 19, 1951, the date of the transfer, the company's gross

sales were $613,910.22. Of this amount, "Recap" accounted for not more than $15,000.

During the week ending November 19, 1951, Minute Mop Company had 65 employees. The number of persons employed by the company fluctuated markedly during the year; in general, fewer persons were employed during the summer months. Thus, the company had 106 employees during the week ending May 12, 1949; 75 for the week ending September 14, 1950; 119 for the week ending May 24, 1951. The portion of the company's business attributable to the sale of the "Recap" device utilized from two to four employees, or approximately 24 man-hours per day.

Excluding certain minor current assets and a Canadian investment, Minute Mop Company had, as of November 19, 1951, assets of $208,088.20, consisting of accounts receivable, $34,731.49; inventory other than "Recap," $141,281.30; "Recap" inventory, $10,394.31; machinery and equipment, $18,681.10, and patent license, $3,000.

On November 7, 1951, Minute Mop and Ekco entered into an agreement under which Ekco purchased, on November 19, 1951, all of Minute Mop's manufacturing machinery and equipment and some of its office equipment for $51,000; the Minute Mop corporate name, trade marks, brands, and trade names and goodwill for $1000, and all of Minute Mop's inventories of finished goods and work in process for $27,541.83, a figure determined upon the basis of material and labor costs. Under this agreement Ekco advanced to Minute Mop Company a sum equal to the difference between $85,000 and the amount paid for the work in process and finished goods inventories. This cash advance of $57,458.17, which Minute Mop needed to pay some of its obligations, was evidenced by Minute Mop's note and secured by assignment and pledge of its inventories of raw materials and supplies. The agreement also gave Ekco the option to purchase raw materials and supplies from Minute Mop Company as Ekco needed them;

such purchases were to be credited against the cash advance made by Ekco. From November 19, 1951, to January 31, 1953, Ekco did purchase raw materials and supplies in the amount of $64,368.19, which liquidated the cash advance and required Ekco to expend further cash. The agreement provided, further, that Minute Mop should shut down its factory and cease operations as of the close of business on November 15, 1951.

Minute Mop Company agreed to deliver to Ekco all manufacturing, processing, scientific and technical data, records and drawings pertaining to its business, lists of customers, sales correspondence, books of accounts, price lists and other records and advertising materials used in the business. Minute Mop further agreed, subject to certain limitations, not to engage in the manufacture or sale of cellulose sponge mops, and other cleaning aids described in its catalog, for a period of five years.

The agreement required Minute Mop to shut down its factory and cease operations therein. Pursuant to the agreement, Minute Mop Company executed and delivered to Ekco a sublease of space in the factory building it occupied, and thereafter Ekco occupied approximately the same space that Minute Mop had used in its manufacturing operations. Minute Mop also caused the execution of a lease from Trindl Building Corporation to Ekco of approximately one third to one half of its warehouse space.

In compliance with the terms of its agreement with Ekco, Minute Mop Company changed its name to Trinco Industries, Inc. This corporation retained those assets of Minute Mop Company which had not been sold to Ekco. After the sale, Trinco Industries, Inc. had, again excluding minor cash assets and the Canadian investment, total assets of $162,103.29, consisting of accounts receivable, $34,731.49; inventory other than "Recap," $113,739.49; "Recap" inventory, $10,394.31; office equipment $1000; delivery equipment, $238; patent license on "Recap,"

$2000. Ekco agreed to act as a collecting agent of the accounts receivable; subsequently, certain uncollected accounts were returned by Ekco to Trinco Industries, Inc.

To continue the Minute Mop operations, Ekco, immediately after November 19, 1951, hired 61 of the 65 Minute Mop Company employees. All but two or three continued to work at the same plant and at the same jobs as they had before. The two or three who did not continue at the old plant were office workers, who were transferred by Ekco to its own plant. The transition occasioned by the sale to Ekco on November 19, 1951, was orderly; employees reported for work, orders were filled, and sales were made, all without interruption.

Ekco's position is that upon these facts, "where $162,000 out of a total of $208,000 of employment providing assets were retained by the prior employing unit," it did not succeed to "substantially all of the employing enterprises," of Minute Mop Company, within the meaning of section 1507 of the Unemployment Compensation Act. Relying upon *Winakor* v. *Annunzio*, 409 Ill. 236, Ekco argues that "where a portion, but not a major portion, of the employment-providing assets of an employment unit are transferred" to a successor unit, the successor has not succeeded to "substantially all of the employing enterprises of another employing unit," within the contemplation of section 1507 of the Unemployment Compensation Act.

In the *Winakor case* Altman's, Incorporated, owned and operated five stores. Upon the death of William Altman, president of the corporation and owner of approximately ninety-seven per cent of its capital stock, the corporation was dissolved and its assets were distributed. Winakor, as testamentary trustee, received three of the five stores; the widow, Ruth Altman, received two and transferred them to a new corporation, Altman's, Inc. The change in ownership and division of assets did not result in any change in the method of operating the five stores

and each continued to keep its own separate and distinct payrolls, profit and loss and other records. Both Winakor and Altman's, Inc. contended that they were entitled to the unemployment experience of their predecessor, Altman's Incorporated. This court rejected their contentions, which were based upon the argument that each store was a separate employer and entitled to its own employment experience despite the single ownership of all the stores. The alternative contention of Alman's, Inc., that it was entitled to the experience rating of the dissolved corporation because it succeeded "to substantially all of the employing enterprises of another employing unit" was also rejected. In disposing of that contention the language relied upon by Ekco was used (p. 247): "Altman's, Inc., succeeded to two of the five stores or approximately 65 per cent of the assets of Altman's, Incorporated. Regardess of whether the employing enterprises of Altman's, Incorporated, be viewed in terms of stores or assets, it is clear that Altman's, Inc., did not acquire substantially all of the predecessor business. In *Auclair Transportation Inc.* v. *Riley*, 69 Atl. 2d (N.H.) 861, it was held that a successor acquiring $34,096, or approximately 89 per cent, of the assets of a predecessor whose total business assets aggregated $38,331 did not succeed to the experience rating of the predecessor under a statute providing that the experience rating of an employer may be transferred to 'an employing unit which acquires the organization, trade or business, or substantially all of the assets thereof.' As stated by the Supreme Court of New Hampshire: 'The word "substantially" is necessarily an elastic term which does not indicate a definite fixed amount of percentage. At one extreme it may be said that the transfer does not have to be 100%. At the other extreme, it may be said that the transfer cannot be less than 90% in the ordinary situation * * *.' The situation disclosed in the case at bar is not so unusual or peculiar as to warrant the conclusion that Altman's, Inc., in

acquiring 65 per cent of the assets of Altman's, Incorporated, succeeded to substantially all the assets of another employing unit."

The *Winakor case* was not intended to establish the dollar value of the assets of the predecessor corporation as the ultimate factor in determining whether the transferee had succeeded to "substantially all of the employing enterprises" of the predecessor. We were there dealing with a transfer of two of five separately owned stores to a new employing unit. In stating the facts we said: "The portion of the assets to which Altman's, Inc. succeeded accounted for approximately 62 per cent of the employees, 68 per cent of the wages paid subject to unemployment contributions and 63 per cent of the gross income of the dissolved corporation. In short, Ruth Altman, and through her Altman's, Inc., acquired about 65 per cent of the assets of the former business, and Winakor, trustee, about 35 per cent." Thus, as Ekco concedes, "The court viewed the acquired assets in the light of the purpose of the act, that is, in terms of the percentage of employees and unemployment compensation contributions accounted for thereby." The term "65 per cent of the assets" was a shorthand expression to summarize factors significant to the provision of employment. Whether viewed in terms of employees, wages, gross income, assets or stores, it was unmistakably clear that Altman's, Inc. had not succeeded "to substantially all of the employing enterprises" of Altman's, Incorporated. Our observation, "Regardless of whether the employing enterprises of Altman's, Incorporated, be viewed in terms of stores or assets," was intended to indicate the absence of doubt under any test, and not to prescribe a test based upon the percentage of assets transferred. Reference to the New Hampshire case may well have been misleading, for under the statute of that State the statutory test for the transferability of employment experience is succession to substantially all of the assets of the predecessor.

Our statute adopts the different standard of "substantially all of the employing enterprises."

It appears, however, that while Ekco disavows an interpretation of the phrase "employing enterprise" as meaning solely the dollar value of assets, its argument approaches that position. For while it speaks of "employment providing" assets it includes in that category the accounts receivable of Minute Mop and its raw materials. We need not decide whether or to what extent the accounts receivable of a manufacturing enterprise are of significance upon the present issue, because by the agreement in this case Ekco became Minute Mop's agent to collect them. Whatever "employment providing" characteristics the accounts receivable had, they went to Ekco and did not remain with Minute Mop. Nor did the raw material inventory which was not taken over by Ekco have "employment producing" qualities. Minute Mop and its owners had agreed not to compete in the manufacture of those products for which the raw materials had been purchased. And the raw materials themselves were pledged to Ekco and under the agreement could be sold to no one else for a period of six months.

In enacting section 1507 the General Assembly based the transfer of employment experience upon a succession to a going business, a commercial or industrial project or undertaking responsible for giving employment to workers, and not merely upon a succession to assets. Factors most directly related to furnishing employment will necessarily vary with different businesses, but the value of assets, alone, will rarely constitute the sole basis for determining the capacity of a business for furnishing employment.

Minute Mop's principal business was the manufacture and sale of cleaning devices. To a limited degree it was also engaged in selling "Recap," a bottle recapping device. Its principal business accounted for 97½ per cent of its gross sales volume; "Recap" accounted for 2½ per cent.

Ekco purchased all of the machinery and equipment used by Minute Mop's employees in the manufacture of the cleaning aids. Plaintiff also acquired Minute Mop's patent rights and licenses, lists of customers, the corporate name, trademarks and good will. It leased Minute Mop's factory and part of its warehouse. Moreover, it obtained Minute Mop's agreement to not engage in its former business for five years. Minute Mop retained the "Recap" part of its business, a comparatively insignificant sideline.

As of November 19, 1951, Minute Mop was employing 65 persons. Only three devoted their time to the sale of "Recap." Ekco thus succeeded to that portion of the enterprise which accounted for the employment of 62 out of 65 persons, or in excess of 95 per cent of the personnel. And 61 of these 62 employees went immediately into the employ of plaintiff, and continued to work on the same premises and in the same capacities.

After the sale, Ekco owned Minute Mop assets accounting for 97½ per cent of its sales; 93⅔ per cent of Minute Mop's employees became its employees, and it occupied, under leases, Minute Mop's manufacturing plant and from one third to one half of its warehouse space. On the other hand, Minute Mop retained less than three per cent of its assets which were productive of sales and but three employees, or less than three per cent, remained in its employ to sell "Recap." In our opinion Ekco succeeded to substantially all of the employment enterprises of Minute Mop.

The judgment of the superior court of Cook County is reversed and the cause remanded, with directions to confirm the determination, order and decision of the Director of Labor.

*Reversed and remanded, with directions.*