351 A.2d 546 (1976)
CORNWALL INDUSTRIES, INC.
v.
MAINE DEPARTMENT OF MANPOWER AFFAIRS, EMPLOYMENT SECURITY COMMISSION.
Supreme Judicial Court of Maine.
January 30, 1976.
*547 Berman, Berman & Simmons, P.A. by Jack H. Simmons, Gary Goldberg, Lewiston, for plaintiff.
Peter S. Dublin, S. Kirk Studstrup, Asst. Attys. Gen., Augusta, for defendant.
Before DuFRESNE, C. J., and WEATHERBEE, POMEROY, WERNICK, ARCHIBALD and DELAHANTY, JJ.
WEATHERBEE, Justice.
On November 12, 1973, the Maine Employment Security Commission (hereinafter the Commission), after an evidentiary hearing, concluded that Cornwall Industries, Inc. had purchased the business of Ard Instruments, Inc. "in toto" within the meaning of 26 M.R.S.A. § 1221(5) and consequently had acquired Ard's unemployment *548 compensation experience rating. Cornwall appealed this decision to the Superior Court of Kennebec County and the matter, upon agreement of the parties, was submitted to a Referee under M.R.C.P., Rule 53(b). The Referee's report affirmed the Commission's decision and the report was adopted in full as the judgment of the Superior Court. Cornwall has now appealed from that judgment. We deny the appeal.
The facts of this case, as found by the Commission, are not in dispute. On June 5, 1972, Ard Instruments, a manufacturer of metal components having its principal manufacturing facility at East Baldwin, Maine, entered into a sale agreement with Cornwall Industries whereby Cornwall agreed to purchase Ard's manufacturing facilities, machinery, equipment, tools, accounts receivable, inventories and all other operating assets, tangible and intangible. Good will was specifically exempted from the agreement.
A purchase and sale agreement, entered into on May 18, 1972 and incorporated by reference into the final agreement, had provided that Ard would use its best efforts to keep its organization intact; would keep available to Cornwall the services of its present officers; and would preserve the good will of those with whom it had business relations. Moreover, that agreement stated that the purpose of the acquisition was to combine "the capabilities, talents, and efforts of both corporations, their officers and employees" for the purpose of manufacturing and marketing clocks, barometers and related consumer items. Cornwall retained the right to use the name "Ard Instruments, Inc.".
Cornwall Industries is composed of several divisions, one of which is Cornwall Classics whose offices and facilities at the time of the sale were located in South Paris, Maine. Cornwall Classics' principal business is the manufacture of wood components used in the production of "decorator" clocks, barometers and lamps. After the acquisition of Ard's facilities in East Baldwin, Cornwall transferred the manufacturing and production facilities of Cornwall Classics to Ard's facilities and changed the name of Ard's plant to Cornwall Classics. Several of Ard's production employees were retained but were employed under new contracts. None of these employees retained their seniority, security or fringe benefits. Ard's former president was hired under an employment agreement as a vice president of Cornwall Industries, with the responsibilities of general manager of Cornwall Classics.
At the time of its acquisition, Ard was a going concern, manufacturing and selling products to its regular customers. Cornwall Classics completed some of Ard's nearly finished items and shipped other finished items to Ard's purchasers, advising that they would no longer supply these items. Cornwall Classics continued to use some of the components previously manufactured by Ard because those items were similar to the components used in the assembly of some of their own products. These components, however, were a small percentage of Ard's entire output.
From these facts both the Commission and the Referee concluded that Cornwall had acquired Ard's business "in toto".
The Commission's findings of fact were adopted by the Referee and are not in dispute here. The Referee's review was limited to the correction of errors at law (Guy Gannett Pub. Co. v. Maine Employment Sec. Com'n, Me., 317 A.2d 183 (1974); DuBois v. Maine Employment Sec. Com'n, 150 Me. 494, 505, 114 A.2d 359, 365 (1955)) and he found there had been none. Our own review of the Referee's report is thus confined to matters of law. M.R.C.P., Rule 53(e)(2).
The consequences of the decision below are better understood after a brief examination of Maine's Employment Security Law, 26 M.R.S.A. §§ 1041-1251 (hereinafter *549 the Act). This Act provides for the accumulation of reserves during periods of employment to be paid to qualified workers during periods of unemployment. The principal source of unemployment benefits is contributions from the employer who is obligated to pay a percentage of his or her annual payroll as specified in 26 M.R.S.A. § 1221. The standard rate of contribution is 2.7% of wages paid. This standard may, however, be varied by reference to the individual employer's experience rating, a tax device establishing differential rates of contribution gauged by the employer's success in keeping his employees from unemployment. This success is measured by the unemployment benefits paid to persons formerly on that employer's payroll. Thus, because relatively few of its former employees had become eligible for unemployment benefits, Cornwall merited an experience rating of 2.0%. Ard, on the other hand, enjoyed a less favorable employment experience and had earned, at the time of sale, a rating of 4.5%.
The issue before this Court is whether Cornwall inherited Ard's experience rating by acquiring its business "in toto" within the meaning of 26 M.R.S.A. § 1221(5). The resolution of that issue requires this Court to construe, for the first time, the words "acquire the business . . . in toto" as used in § 1221(5)(A) which states:
"A. The executors, administrators, successors or assigns of any employer who acquire the business of such employer in toto shall acquire the experience of such employer with payrolls, contributions and benefits. Effective as of the date on which such business was acquired, the commission shall for purposes of rate determination transfer to the successor employer the payroll record and experience rating records of the predecessor employer."
Two possible interpretations of this section are urged upon us. Appellant argues that section 1221(5)(A) applies only when the actual continuity between the old and new enterprises is sufficient to perpetuate the risks of unemployment created by the predecessor. The appellant's identity-of-the-risk rationale looks to the successor's subsequent conduct of the business in determining whether the continuity of the business reflects a likelihood that the experience of the predecessor is indicative of the probable experience of the successor. The referee, on the other hand, concluded that the proper test under section 1221(5)(A) was whether the new employer had the capacity, at the moment of acquisition, to maintain continuity of the enterprise. Under this standard, the successor would inherit his predecessor's experience rating if, on the date of acquisition, he could have continued his predecessor's business had he so chosen. This test differs from that suggested by the appellant in that it disregards the subsequent conduct of the business. We believe it to be the proper test for the application of section 1221(5).
While section 1221(5) has never been interpreted by this Court, a somewhat similar issue was decided in Stewart v. Maine Employment Sec. Com'n, 152 Me. 114, 125 A.2d 83 (1956). Both the appellant and appellee claim to derive support from Stewart and the case must therefore be considered in some detail.
Stewart addressed the meaning of "employer" as used in 26 M.R.S.A. § 1043(9) (C) of the Act which reads:
"`Employer' means:
. . . . . .
C. Any individual or employing unit which acquired the organization, trade or business, or substantially all the assets thereof, of another employing unit not an employer subject to this chapter and which, if subsequent to such acquisition it were treated as a single unit with such other employing unit, would be an employer *550 . . . [as elsewhere defined in this chapter]."
The Court determined that the phrase "acquire the organization, trade, or business" referred to situations in which there is "continuity of the enterprise relatively uninterrupted by the transfer of ownership." 152 Me. at 117, 125 A.2d at 84. The alternative criterion of subsection (9)(C), "substantially all the assets thereof", was read literally by the Court which concluded that the phrase required a purchase of substantially all the seller's physical or tangible assets. The Stewart Court clearly distinguished between the acquisition of a business and the acquisition of assets and held that the former "contemplated a situation in which there is continuity of the enterprise relatively uninterrupted by the transfer of ownership." 152 Me. at 117, 125 A. 2d at 84. From this decision appellant rightfully concludes that the acquisition of physical assets is only part of the test for measuring the acquisition of a business. Appellant further argues, however, that Stewart requires the Commission to apply the actual continuity of the enterprise test under section 1221(5) as well as under section 1043(9)(C) and thereby invests the case with a meaning it cannot properly support.
The issue in Stewart was whether the petitioner qualified as an employer within section 1043, the Act's definitional section. Section 1043(9)(A) defined an employer generally as one who employed eight or more persons for each of twenty different weeks.[1] The remaining paragraphs of subsection 9 enumerated specific instances in which a person was liable as an employer under the Act. Paragraph (C) required that the employment experience of one who acquires a business (or substantially all its assets) be coupled with that of his predecessor to determine whether the successor becomes chargeable as an employer under paragraph (A) when neither, alone, had employed 8 employees for 20 weeks.
The purpose of paragraph (C) is to insure employment security for the employees of an employment unit even though the identity of the employer changes during the period. The Legislature recognized that the transfer of ownership of either the (1) organization, trade, or business or (2) substantially all of its assets would usually result in continued operation under new ownership and intended that this should not change the status of the employees as to entitlement to employment security benefits. Thus the necessity for "tacking" employment experience in order to carry out the purposes of the Act was evident when ownership of either business or assets was transferred.
In Stewart, neither the petitioner nor the estate from which he purchased the business, standing alone, qualified under paragraph (A) because neither had employed the requisite number of employees for twenty different weeks. Section 1043(9)(C) creates two alternative criteria for potential chargeability as employer and Stewart tests its facts against each in turn. While the Commission was obviously unable to complete its determination of whether the new management was an "employer" as defined in subsection 9(A) until it became evident that it had employed eight or more employees a sufficient number of weeks to total twenty by tacking, the other part of the test, subsection (C)'s alternative criteria for potential chargeability as an employer  that is, the acquisition of (1) the organization, trade or business or (2) substantially all the assets  were capable of being evaluated at the time the purchase was completed. We *551 read Stewart to require the Commission to base its decision as to this aspect of chargeability upon the situation at the time of acquisition and not on the manner in which the new owner later conducts the business. We understand the Stewart test of appropriateness for tacking to rest upon the new owner's capacity at the time of acquisition to continue the business as a going concern.
The Stewart Court examined the facts of the acquisition of the "organization, trade or business" and concluded that the new owner did not acquire from the old owner a sufficient number of the usual incidents of the acquisition of an entire business so that the enterprise could be expected to continue relatively uninterrupted by the transfer of ownership. For our present purposes we find it significant that the Court summarized its conclusion with these words:
"Certainly upon these facts the entire `business' as it was constituted on April 1, 1951 [the date of acquisition] was not `acquired' by the petitioner." Stewart v. Maine Employment Sec. Com'n, 152 Me. at 117, 125 A.2d at 84. (Emphasis added.)
The Court went on to explain, in part, that although the new owner did take over the leasehold interest in the garage, he got this not from the representative of the deceased owner but, instead, from a third party. Similarly, the Court noted, while some of the former employees became employed by the new owner, this did not result from any assignment of contractual rights to their services by the representative of the old owner but that, instead, they were hired individually and independently. The Court's evaluation of the new owner's acquisition of "assets" is similarly directed to April 1, 1951.
In a like manner, we believe, the Commission looks to the acquisition itself to decide whether the new owner has acquired the business from the former owner "in toto" under section 1221(5)(A). We are unconvinced that the Legislature intended that the issue should be determined by the use which the new owner decides to make of the business he has acquired. The language of section 1221(5)(A) suggests no other interpretation. Neither does policy. As the Referee commented, the Commission should be able to base its decision upon clearly demonstrable objective evidence rather than on a subjective factor such as the nature and timing of a subsequent management decision. The test, the Referee concluded, was the new owner's capacity, with what interests it had acquired, when it acquired them, to carry on the former owner's business in its significant aspects without a break in continuity  not whether it later chose to phase out part of the former operation. We agree with the Referee. Although the Referee gave some attention to the operation of the business subsequent to acquisition, it was for the purpose of demonstrating that the subsequent operation proved that the new owner had acquired the capacity to continue the former's business if it chose to do so.
Section 1221(5)(A)'s use of the words "business . . . in toto" instead of "organization, trade or business" requires consideration. The words "organization, trade or business" were chosen by the Legislature as one of the alternative tests for chargeability under section 1043(9)(C) when the Act was enacted in 1936. P.L. 1943, ch. 331, § 7(e)(1)(2) added the section 1221(5)(A) with the language "in toto" with which we are now concerned.
The Legislature was therefore aware of the criteria of section 1043(9)(C) when it enacted section 1221(5)(A) and its rejection of those standards for the singular language of 1221(5)(A) is significant. Even if we do not read "in toto" literally, the phrase so emphatically imparts a sense of wholeness that the Legislature must have intended in section 1221(5)(A) to establish a more stringent standard than that of section 1043(9)(C).
*552 We are of the opinion that the Legislature meant to embody in 1221(5) and 1043(9)(C) the same general principle that the new owner must have acquired the capacity to continue the enterprise relatively uninterrupted by the transfer of ownership with this important difference: under section 1043(9)(C), the overriding purpose was to make available assistance during periods of unemployment for employees who were very likely to be employed to the number of eight or more for a total of at least twenty weeks by the combined old-new ownership and the alternative test (business or assets) more appropriately met this purpose in a wider variety of situations. Section 1221(5)(A) speaks to a situation in which the employees are already under the Act and determines only the initial rate of contribution by the new employer. The actuarial nature of this rate fixing function demands more selectivity. Instead of the alternative test of business or assets, the Legislature required a sharper indication of capacity to continue the enterprise than is necessitated by section 1043(9)(C).
In construing the dimensions of the term "in toto" we are aware that the Maine Employment Security Law is a remedial statute and must be construed liberally for the purpose of accomplishing its objectives which are the stabilization of economic conditions and the amelioration of the effect of unemployment on the worker. Stewart v. Maine Employment Sec. Com'n, 152 Me. at 120, 125 A.2d at 86. These two purposes, however, are not coequal and later cases have so emphasized the latter objective that we now believe the primary objective of the Employment Security Act to be the alleviation, through the creation of an unemployment insurance fund, of economic hardship incident to unemployment. See, e. g., Bass & Co. v. Maine Employment Sec. Com'n, Me., 250 A.2d 492 (1969); Toothaker v. Maine Employment Sec. Com'n, Me., 217 A.2d 203 (1966); Burns, Unemployment Compensation and Socio-Economic Objectives, 55 Yale L.J. 1 (1945).
Appellant would resolve the dilemma posed by the instant case by imposing upon it the purposes and policies underlying the Act. Because an experience rating is an actuarial predication of the risks of future unemployment created by an employer, appellant argues that the rating should be transferred only when the successor is likely to perpetuate the unemployment risks of his predecessor. This argument has considerable merit, but we must reject it. In positing the unemployment risk as its controlling criterion, appellant perceives the purpose of the Act too narrowly. Certainly, it is possible that the prospects of acquiring an unsuccessful predecessor's burdensome experience rating could deter a prospective buyer from taking over a collapsing enterprise and thus actually contribute to unemployment. Burns, Unemployment Compensation and Socio-Economic Objectives, supra. We would give this fact more weight if we believed that the stabilization of employment conditions was the primary purpose of the Act. We have concluded, however, that the primary purpose of the Act is the amelioration of unemployment hardship. This Court has previously characterized reduced experience ratings as rewards or bonuses. Maine Employment Sec. Com'n v. Charest, 158 Me. 43, 51, 177 A.2d 654, 658 (1962). This characterization is fully consistent with our present conclusion that employment stabilization is only a secondary purpose of the Act and may not, therefore, control or restrict its primary purpose. We therefore reject the appellant's argument.
While the standard "in toto" seems unmistakably more strict than either of those in section 1043(9)(C)  in fact, in a sense, it combines those two alternatives into one criterion  the phrase should not be read so literally as to require a complete transfer of the entire business interests. *553 The Legislature must be presumed to have established a workable standard for application on a case by case basis. Such a standard could not require a transfer of every wrench on a workshop shelf. In construing a statute, the Court should avoid an interpretation which would lead to an absurd result even though it must disregard the strict letter of the statute. Greaves v. Houlton Water Co., 143 Me. 207, 59 A.2d 217 (1948). The term contemplates, however, a transfer of substantially all of both of the factors which combine to constitute the business (as defined in Stewart) and the tangible assets of the company.[2]
We therefore conclude that "business. . . in toto" must be interpreted as embracing a combination of factors, no one of which may be determinative, but which, in the aggregate, indicate the successor's capacity to perpetuate the business of his predecessor. Among these factors are the extent to which the successor's enterprise is to retain its pre-transfer identity, its capacity to produce similar goods and services, continuity of management, similarity in methods of production and distribution, identity of the employment force, and the amount of assets, particularly employment producing assets[3] transferred.
The Commission found that on the date of acquisition, Ard transferred to Cornwall all of its manufacturing and office equipment, its corporate name, its facilities, inventories and work in progress, its patent rights and trade names, and its customer lists. Ard's former president was hired as plant manager and was to share in the profits derived from the operation of the facility he had previously operated as Ard Instruments, Inc. These facts permitted the Referee to observe that "at the moment of acquisition, the buyer took over not only all of the assets and liabilities of Ard but also a relationship to Ard's suppliers and, customers, its officers and employees." Whatever subsequently may have been the case, on the date of acquisition Cornwall was able to operate the business as an independent employing unit producing the same products for the same customers in the same manner as its predecessor. Under these circumstances, Cornwall Classics had the potential of being a virtual reincarnation of Ard Instruments and we therefore agree with the conclusion of the Referee that Cornwall acquired the business of Ard "in toto" within the meaning of section 1221(5).
*554 The Justice was not in error in accepting the Referee's report.
The entry will be:
Appeal denied.
All Justices concur.
NOTES
[1] The criteria of section 1043(9)(A) have been somewhat modified since Stewart. Instead of eight employees, the statute required only four for the years between 1956 and 1972. After 1972, "Employer" means any employing unit which paid annual wages of $1500 or more or employed one or more individuals in each of twenty different weeks. Beyond the incorporation of this change, paragraph (C) has remained unaltered.
[2] We note, that in connection with experience rating transfers, courts in other jurisdictions have avoided the more inclusive definitions of "employer" set out in the general definitions of their unemployment statutes. E. g. Sulloway v. Rolfe, 94 N.H. 85, 47 A.2d 109 (1946). Finally, unlike the experience rating transfer provisions of most jurisdictions, 1221(5) does not expressly make any single factor controlling. E. g. Auclair Transportation, Inc. v. Riley, 96 N.H. 4, 69 A.2d 861 (1949). (The New Hampshire statute required a transfer of substantially all the assets. The Court concluded that this meant less than 100% but more than 90% of the assets); Michigan Unemployment Security Commission v. Arrow Plating Co., 10 Mich. App. 323, 159 N.W.2d 378 (1968) (the Michigan statute required a transfer of the business, trade or organization or 75% of the assets); Canada Dry Bottling Co. v. Board of Review, 118 Utah 619, 223 P.2d 586 (1950) (the Utah statute required a transfer of substantially all the assets).
[3] Cf. Ekco Products Co. v. Cummins, 5 Ill.2d 307, 125 N.E.2d 526 (1955). The Illinois transfer statute required a transfer of substantially all the employing enterprises. In a decision of great good sense, the Illinois Supreme Court refused to apply the standard in terms of any predetermined percentage of assets. Reasoning that the acquisition should be viewed in terms of the percentage of employees and unemployment compensation contributions accounted for by the transfer, the Court concluded that it would look to the employment producing qualities of the acquired assets. Such a view is consistent with the idea that a successor employer acquires an enterprise capable of generating employment and not merely a collection of assets.