**MARION COUNTY SHERIFF'S MERIT BOARD, Appellant (Defendant Below)**
and
**Michael R. Berry, and Rex E. Thompson, Appellants (Third–Party Plaintiffs Below),**
**v.**
**PEOPLES BROADCASTING CORP., VideoIndiana, Inc., Susquehana Broadcasting Co., Inc., d/b/a Radio Indianapolis, Inc., Tel–Am Corp., McGraw Hill Broadcasting Corp., Inc., Steven E. Sweitzer, Michael J. Androvett, Joseph Hallinan and Indianapolis Newspapers, Inc., Appellees (Plaintiffs Below).**

No. 41S01–8911–CV–872.

Supreme Court of Indiana.

Nov. 22, 1989.

Barbara Malone, Asst. Corp. Counsel, City–County Legal Div., for appellants Marion County Sheriff's Merit Bd. and Marion County Sheriff.

John C. Ruckelshaus, John F. Kautzman, Ruckelshaus, Roland, Hasbrook & O'Connor, Indianapolis, for appellants Michael R. Berry and Rex E. Thompson, individually and as Marion County Sheriff's Deputies.

Richard A. Waples, Indiana Civil Liberties Union, Indianapolis, for appellees Peoples Broadcasting Corp., VideoIndiana, Inc., Susquehana Broadcasting Co., Inc., d/b/a Radio Indianapolis, Inc., Tel-Am Corp., McGraw Hill Broadcasting Corp., Inc., Steven E. Sweitzer, Michael J. Androvett.

Robert P. Johnstone, Jan M. Carroll, Barnes & Thornburg, Indianapolis, for appellees Indianapolis Newspapers, Inc., and Joseph Hallinan.

SHEPARD, Chief Justice.

The question presented is whether a county sheriff's merit board may conduct an executive session to discuss the evidence presented during its public hearing on disciplinary charges against a deputy and then proceed to take final action in public. We hold it may.

This question comes to us as the second part of one lawsuit. In the first part, the Johnson Circuit Court ordered the Marion County Sheriff's Merit Board to conduct its disciplinary hearings in public and permit the use of cameras and recorders at those hearings. The Court of Appeals ultimately affirmed those orders in *Berry v. Peoples Broadcasting Corp.* (1987), Ind.App., 514 N.E.2d 1283 (*Berry I*) and we affirm them in a companion decision issued today.

The facts giving rise to this appeal occurred soon after the trial court's final judgment on *Berry I*. On January 22, 1987, even before a motion to correct error was filed in *Berry I*, legal counsel for the merit board sent a letter to arrange another disciplinary hearing. Counsel notified the parties that the merit board would not seek appellate review, leaving the sheriff's deputies as the only appellants in *Berry I*. Counsel further explained that the board would not enforce its Rule 505(B)(3) during the hearing conducted pursuant to Ind. Code § 36–8–10–11. Thus, the board would permit the reasonable use of recording devices. Significant to the issue of this case, the letter also stated:

> [T]he Merit Board will commence by hearing testimony in public with an executive session held immediately subsequent thereto for the purpose of discussing the testimony and the charges lodged against the Deputies. Final action, e.g., a vote, will be taken in public subsequent to the executive session.[1]

After receiving this notice, the media parties initiated *Berry II* by returning to the trial court seeking a permanent injunction against the merit board's plans for such an executive session. The trial court found that the "deliberations" of the merit board must be conducted openly, citing *Citizens Action Coalition v. Public Service Commission* (1981), Ind.App., 425 N.E.2d 178, and Ind.Code § 5–14–1.5–1. It entered judgment as follows: "The Court therefore permanently enjoins the sheriff's merit board from closed session deliberations in disciplinary hearings held pursuant to I.C. 36–8–10–11."

The merit board and the deputies appealed that order. A divided First District of the Court of Appeals affirmed the trial court and held that the "deliberative session of the board is subject to the Open Door Law and that it should be open to the public." *Sheriff's Merit Board v. Peoples Broadcasting Corp.* (1988), Ind.App., 530 N.E.2d 755 (*Berry II*). The First District's opinion did not discuss Ind.Code § 36–8–10–11 ("fair public hearing"); it was grounded solely in a statutory inter-

---

1. The record also contains a letter from the merit board attorney denying the deputies' request for the entire hearing to be conducted in executive session.

pretation of Ind.Code § 5–14–1.5–1 to –7, the Indiana Open Door Law.[2] We grant transfer.

This issue turns upon statutory interpretation of the Open Door Law and the statute on disciplinary proceedings for sheriffs' departments.

If the only law controlling this question were the Open Door Law, the merit board's plan to hold an executive session as announced in its letter of January 22, 1987, would be permissible under Ind.Code § 5–14–1.5–6(b)(5)(A)–(B). That section reads: "(b) Executive sessions may be held only in the following instances: (5) 'With respect to any individual over whom the governing body has jurisdiction: (A) To receive information concerning the individual's alleged misconduct; and (B) *To discuss, prior to any determination, that individual's status as an employee....*' " (emphasis added).

While *Berry I* considered the relationship between subsection A and the merit law's fair public hearing requirement, this case requires analysis of subsection (B) and the fair public hearing requirement. The merit board proposed to "discuss[ ] the testimony and charges lodged against the deputies." Such a discussion fits within Ind.Code § 5–14–1.5–6(b)(5)(A)–(B).

A conflict arises, however, when the Open Door Law is juxtaposed with the merit board's own law on disciplinary proceedings. That statute, Ind.Code § 36–8–10–11(a), states, in pertinent part: "The sheriff may dismiss, demote, or temporarily suspend a county police officer *for cause* after preferring charges in writing and after a *fair public hearing before the board....*" (emphasis added).

■ Our analysis begins with basic principles of statutory interpretation. When two statutes apply to the same subject they must be construed in harmony if possible. *Schrenker v. Clifford* (1979), 270 Ind. 525, 387 N.E.2d 59; *Bell v. Bingham* (1985), Ind.App., 484 N.E.2d 624. This rule, by definition, must be applied before any other rules of statutory construction are applied.

Two lines of reasoning lead us to conclude that these two statutes may be construed harmoniously. First, conducting a "fair public hearing" under Ind.Code § 36–8–10–11 does not conflict with conducting an executive session for discussions among board members prior to their determination under Ind.Code § 5–14–1.5–6(b)(5)(B). A hearing is testimony and argument heard by the merit board from the disputants before it. It does not include deliberations or discussions by the merit board members with each other. Second, our understanding of the first amendment and the due process provisions of the fifth and fourteenth amendments to the federal constitution suggests that the statutes should be interpreted in a way that assures a fair determination of the deputies' rights in their employment.

### I. *Fair Public Hearing*

■ We construe "fair public hearing" as not conflicting with the merit board's proposed use of the Open Door Law's executive session provision. In construing statutes, words and phrases must be given plain, ordinary and usual meaning, unless a contrary purpose is clearly shown by the statute itself. *Clipp v. Weaver* (1983), Ind., 451 N.E.2d 1092; *Overlade v. Wells* (1955), 234 Ind. 436, 127 N.E.2d 686. In determining the plain, ordinary and usual meaning of fair public hearing, we first examine the meaning of "hearing" to discover whether any conflict with the applicable executive session provision exists. We understand "hearing" to include the pre-

---

**2.** The Court of Appeals stated:
"Of the occasions so enumerated as situations where an executive session is authorized none makes mention of the deliberative process. We can only conclude that since the deliberative process is excluded from the list of occasions where an executive session is allowed that the legislature intended for it to be open to the public and we so hold."

*Sheriff's Merit Board*, Ind.App., 530 N.E.2d at 755.

We conclude instead that the pertinent section on executive sessions, Ind.Code § 5–14–1.5–6(a)(5)(B), uses the word "discuss" in a way which includes "deliberate" as used by the merit board in its January 22, 1987, correspondence.

sentation of evidence, rebuttal of evidence, and argument about the evidence; but the term in its plain, ordinary and usual meaning does not include the exchange of thoughts by the merit board members. The most common understanding of a "hearing" is that the appropriate members of the agency *hear* the facts, the characterization of facts, and argument about the facts.[3] This meaning of "hearing" is adopted by each of the authorities we have been able to find.[4] The parties have not presented any contrary understandings.

As for the term "public" in this context, we construe that much in the same way as the first and sixth amendment's right of access by media and the accused's right to a "public trial." In construing those rights, the Supreme Court has held that the presentation of evidence and argument about the evidence are public but not the jury's or judge's deliberations. *See generally Richmond Newspapers, Inc. v. Virginia*, 448 U.S. 555, 100 S.Ct. 2814, 65 L.Ed.2d 973 (1980). Practical human experience indicates that private discussions permit greater candor among board members in evaluating their judgments.[5] Their judgment will still contain all the necessary elements for rigorous public scrutiny: the evidence presented, the evidence debated and the final decision explained by findings

---

**3.** *See* 1–2 K. Davis, Administrative Law Treatise, §§ 6:22, at 556, 12:10, at 448 (2d ed. 1979).

**4.** "The presentation of a case or defense before an administrative agency, with opportunity to introduce evidence in chief and or rebuttal, and to cross-examine witnesses, as may be required for a full and true disclosure of the facts." *Ballantine's Law Dictionary* 553 (3d ed. 1969).

"A hearing is a proceeding of relative formality held in order to determine issues of fact or law in which evidence is presented and witnesses are heard. The party responding to the changes made by the agency must be given an opportunity to rebut evidence and cross-examine witnesses." *Stovall v. State* (1985), Ind., 477 N.E.2d 252, 254 (quoting *Hunt v. Shettle* (1983), Ind.App., 452 N.E.2d 1045, 1050).

"A statute requiring opportunity for 'hearing' must be interpreted to mean hearing with a determination on the record, that is, a trial-type hearing, if the interest at stake is protected by due process and if adjudicative facts are in dispute." 2 Davis, *supra* note 3, § 12:10, at 449.

"A hearing in its very essence demands that he who is entitled to it shall have the right to support his allegations by argument however brief, and, if need be, by proof, however informal." *Londoner v. Denver*, 210 U.S. 373, 386, 28 S.Ct. 708, 714, 52 L.Ed. 1103, 1112 (1908). *See also* 88 C.J.S. *Trial* § 1 (1955); Friendly, *Some Kind of Hearing*, 123 U.Pa.L.Rev. 1267, 1279–1295 (1975).

**5.** "Human experience teaches that those who expect public dissemination of their remarks may well temper candor with a concern for appearances and for their own interests to the detriment of the decision-making process." *United States v. Nixon*, 418 U.S. 683, 705, 94 S.Ct. 3090, 3106, 41 L.Ed.2d 1039, 1062 (1974).

This understanding of human experience is not lost on first amendment litigants. In arguing before the Supreme Court against public disclosure of CBS's editorial deliberations, Floyd Abrams wrote:

Disclosure of the editorial process of the press would inhibit the 'full and candid discussion within the newsroom itself' (Pet. 11a; opinion of Kaufman, C.J.) which lies at the very heart of the editorial process. The need for protection against the compelled disclosure of decision-making processes such as the editorial process of the press which are charged with societal and constitutional significance has long been recognized for each branch of the federal government. The dangers attendant upon compelled disclosure of deliberative and mental processes are, we argue, no less real and threatening for the press.

Brief of Respondents at 17, *Herbert v. Lando*, 441 U.S. 153, 99 S.Ct. 1635, 60 L.Ed.2d 115 (1978) (Written by Floyd Abrams, Esq., of Cahill, Gordon & Reindel for respondents Barry Lando, Mike Wallace and CBS, Inc.). While the applicable legal principles are decidedly different, the psychology is identical.

*See also Maressa v. New Jersey Monthly*, 89 N.J. 176, 188, 445 A.2d 376, 382–83, *cert. denied*, 459 U.S. 907, 103 S.Ct. 211, 74 L.Ed.2d 169 (1982) (discovery of editorial communications between newspersons and a newsperson's belief in the veracity of what he or she pursues and publishes is especially threatening to newspersons because it inhibits the exchange of ideas). *See also Rosario v. The New York Times*, 84 F.R.D. 626 (S.D.N.Y.1979) ("I find the objection well taken to an inquiry into the discussions between Sulzberger [publisher of *The Times*] and Rosenthal [executive editor of *The Times*] as to the nature of the column to be written by Wilkins.").

The U.S. Supreme Court's interpretation of Exemption 5 of the Freedom of Information Act, 5 U.S.C. § 552(b)(5) makes clear that the executive branch privilege does not protect merely "factual" material, but only "deliberative or policymaking processes." *EPA v. Mink*, 410 U.S. 73, 89, 93 S.Ct. 827, 837, 35 L.Ed.2d 119, 133 (1973).

of fact in writing. *See* Ind.Code § 36–8–10–11(a) ("The board shall make specific findings of fact in writing to support its decision").

Thus, because the plain meaning of a "fair public hearing" does not include private discussions permitted by section 6 of the Open Door Law, we hold that the merit board may proceed as it proposed in its January 22, 1987, correspondence. This statutory construction contrasts with our conclusion in *Berry I* that the provision of executive sessions for the receipt of evidence conflicts with the fair public hearing provision of Ind.Code § 36–8–10–11 and that the latter must prevail.

### B. *Due Process*

This statutory interpretation must proceed in light of the fifth and fourteenth amendment due process rights of the officers. Justice Bobbitt explained the role of constitutional consideration in statutory interpretation: "The law is well settled that we should construe a statute, if there is doubt as to its meaning, in favor of an interpretation which accords due process to the parties rather than to adopt a construction which denies due process and invalidates the statute." *Knoy v. Indiana Real Estate Commission* (1959), 239 Ind. 379, 383, 157 N.E.2d 825, 828.

Procedural due process protections are afforded the two deputies because they have a property interest at stake. *See Board of Regents v. Roth*, 408 U.S. 564, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972). The property interest in this case was created by the merit board statute, Ind.Code § 36–8–10–11(a). That statute creates a legitimate claim of entitlement by the sheriff deputies to their jobs. The constitutional right to due process attaches once the legislature creates a property interest in a civil service job. *Cleveland Board of Education v. Loudermill*, 470 U.S. 532, 105 S.Ct. 1487, 84 L.Ed.2d 494 (1985).

When protected interests are implicated, the Court in *Roth* suggests the extent of

process required is "notice and opportunity for hearing appropriate to the nature of the case...." *Roth*, 408 U.S. at 570 n. 7, 92 S.Ct. at 2705 n. 7, 33 L.Ed.2d at 556 n. 7 (quoting *Bell v. Burson*, 402 U.S. 535, 542, 91 S.Ct. 1586, 1591, 29 L.Ed.2d 90, 96 (1971)).

The Supreme Court uses a balancing test to determine what procedures due process requires. *Mathews v. Eldridge*, 424 U.S. 319, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976) (termination of Social Security disability payments); *Arnett v. Kennedy*, 416 U.S. 134, 94 S.Ct. 1633, 40 L.Ed.2d 15 (1974) (termination of government employment). In *Mathews*, Justice Powell described the relevant considerations as:

> First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requisites would entail.

*Mathews*, 424 U.S. at 335, 96 S.Ct. at 903, 47 L.Ed.2d at 33.

The *Mathews* test is commonly used to determine whether due process requires additional procedural safeguards to protect an individual's property or liberty rights. While litigants are more often before courts urging that *Mathews* entitles them to a hearing, the basic purpose of this test is determining what process is due. *Mathews* thus applies to the question at hand.

The first step in the *Mathews* analysis addresses the private interest threatened by the board's action. In this case, that interest is a substantial one, the right to continued civil service employment terminable only upon a fair public hearing.[6] Second, the risk of erroneous deprivation of that interest, as we noted earlier, arises out of the chilling effect of requiring board

---

6. "The essential guarantee of due process is that of fairness. The procedure must be fundamentally fair to the individual in the resolution of the factual and legal basis for governmental actions which deprive him of life, liberty or property." J. Nowak, R. Rotunda, J. Young, *Constitutional Law* 557 (2d ed. 1983).

members to muse publicly about the relative credibility or dubiosity of the witnesses and parties before them. Third, the government interest in reaching the best possible personnel decision can be narrowly tailored through public airing of the evidence and private discussion of the merits, and public action and entry of findings.

The principles from *Mathews* suggest that reading the statutes so as to require that the deputies' fate be deliberated under the circumstances urged by appellees would mean a deprivation of the deputies' due process rights. The prospect of such a deprivation favors a statutory construction which accords due process. *Knoy,* 239 Ind. 379, 157 N.E.2d 825.

A countervailing constitutional right, however, is asserted by the media parties. They argue that the first amendment's right of access dictates open deliberations. *See Press Enterprise Co. v. Superior Court,* 464 U.S. 501, 104 S.Ct. 819, 78 L.Ed.2d 629 (1984); *Globe Newspaper Co. v. Superior Court for the County of Norfolk,* 457 U.S. 596, 606–67, 102 S.Ct. 2613, 2620, 73 L.Ed.2d 248, 256–57 (1982) ("the state's justification in denying access must be a weighty one ... it must be shown that the denial is necessitated by a compelling governmental interest and is narrowly tailored to serve that interest."). None of the cases cited by the media on the right of access, however, extends that right to judicial, jury, or administrative deliberations. Indeed, one of the cited cases describes the limits of the first amendment's right of access:

> The Constitution is not, however, a Freedom of Information Act. *See Houchins* [*v. KQED*] 438 U.S. [1] at 14, 98 S.Ct. [2588] at 2596 [57 L.Ed.2d 553 (1978)]. There are limits to the right of access. It is doubtful that the right of access would extend to informal interviews or internal agency deliberations. A right of access is not a license to force disclosure of confidential information or to invade the decisionmaking processes of governmental officials. In this case, this court decides only that the press and public have a first amendment right of access

to formal administrative fact-finding hearings.

*Society of Professional Journalists v. Secretary of Labor,* 616 F.Supp. 569, 577 (D. Utah 1985).

Further, the Supreme Court has long recognized a general bar against probing "mental processes" of administrative decision-makers. *United States v. Morgan,* 313 U.S. 409, 422, 61 S.Ct. 999, 1004, 85 L.Ed. 1429, 1435 (1941); *Citizens to Preserve Overton Park v. Volpe,* 401 U.S. 402, 420, 91 S.Ct. 814, 825, 28 L.Ed.2d 136, 155 (1971). In short, we think the constitutional issues apparent in this case, on balance, militate against the trial court's decision and in favor of reading the statute as we have.

We reverse the judgment of the trial court.

DeBRULER, GIVAN, PIVARNIK and DICKSON, JJ., concur.