**ASHLIN TRANSPORTATION SERVICES, INC., Appellant–Petitioner,**

v.

**The INDIANA UNEMPLOYMENT INSURANCE BOARD (by its members Edward Yates, Jamie Andree, W. Ken Massengill, Larry Meeks, Jerry Payne, Larry Tebault and Edmund Thais), The Indiana Department of Employment and Training Services, and Liability Administrative Law Judge Alan R. Diodore, Appellees–Respondents.**

No. 93A02–9310–EX–538.

Court of Appeals of Indiana, First District.

June 29, 1994.

Norman R. Garvin, Lynne D. Lidke, Steven A. Pletcher, Scopelitis, Garvin, Light & Hanson, Indianapolis, for appellant.

Pamela Carter, Atty. Gen., Robert K. Robisch, Deputy Atty. Gen., Indianapolis, for appellees.

NAJAM, Judge.

## STATEMENT OF THE CASE

Ashlin Transportation Services, Inc. appeals from a decision of the Liability Administrative Law Judge ("LALJ") of the Indiana Department of Employment and Training Services ("IDETS") who found that Ashlin is not a "successor employer" within the meaning of Indiana Code § 22–4–10–6(b) of the Indiana Employment and Training Services Act ("the Act").[1] Ashlin, an employee leas-

ing company in the trucking industry, requested that IDETS make a determination of Ashlin's successorship status after Ashlin acquired the truck drivers of two trucking companies and then leased back the same employees to their former employers. IDETS denied Ashlin's initial request and, after a subsequent denial upon reconsideration, Ashlin sought and was granted a hearing before an LALJ. The LALJ heard evidence and affirmed IDETS' determination denying successor employer status to Ashlin under the Act. Ashlin appeals from that adverse decision.

We reverse and remand.

## ISSUE

The sole question presented for our review is whether the LALJ erred in concluding, as a matter of law, that Ashlin is not a "successor employer" within the meaning of Indiana Code § 22–4–10–6(b).[2]

## FACTS

The following facts are undisputed according to the parties' Agreed Statement of the Evidence. *See* Record at 74–81. Ashlin is an employee leasing company whose primary business is leasing truck drivers to trucking companies. In addition, Ashlin leases to its clients some clerical and administrative employees utilized in the trucking industry. Ashlin is one of about 1200 employee leasing companies in the United States today. Since 1986, when Ashlin was established, it has grown from less than 100 to over 1600 employees, most of whom are truck drivers, by acquiring the employees of approximately 50 companies.

Ashlin offers two types of employee leasing services to its trucking clients. First, Ashlin advertises for, recruits, and hires truck drivers who are then placed in positions with Ashlin's clients. Second, as was the case here, Ashlin assumes all of the employment responsibilities of a client and then leases back the client's former employees, primarily truck drivers, to the company. In other

---

1. IND.CODE § 22–4–1–1 *et seq.*

2. We have jurisdiction of this cause pursuant to Appellate Rule 4(C). *See* IND.CODE § 22–4–32–9.

words, Ashlin acquires the truck driving force of a trucking company and becomes responsible for those drivers as Ashlin's own employees.

In this case, Ashlin performs the second type of leasing service by which, after acquiring its clients' employees, it also assumes all the responsibilities of employment. Ashlin pays the employees' wages, is responsible for taxes, insurance coverage and other benefits, maintains worker's compensation and unemployment compensation plans, establishes safety programs, and offers bonus programs for the employees. After acquiring a company's employees, Ashlin executes a new employment contract with each employee which contains essentially the same terms as the contract with the employee's previous employer. Moreover, there is no lapse in the employee's actual employment during the transfer of responsibilities from a client to Ashlin.

On June 1, 1992, Ashlin acquired all of the truck drivers of Wabash Valley Transportation, Inc. ("Wabash") and Atlantic Inland Carriers, Inc. ("Atlantic"), two of Ashlin's trucking company clients. Ashlin then leased back those employees to Wabash and Atlantic on the same day without a lapse in employment. Each of Ashlin's newly acquired employees executed an employment contract with Ashlin consisting of terms equivalent to the terms of their contracts with Wabash or Atlantic. As trucking companies, Wabash and Atlantic each retained assets and management necessary to continue their businesses. Those assets included Wabash's and Atlantic's rolling stock, terminals, motor carrier operating authority, and other necessary components of a trucking company, including financial assets. Ashlin acquired none of those assets and, in fact, Wabash and Atlantic continued to operate their trucking businesses as they had before Ashlin acquired their employees. Ashlin did not operate trucks or serve truck routes itself.

At the time Ashlin acquired Wabash's and Atlantic's truck drivers, all three companies were considered "employers" under the Act. However, the LALJ denied Ashlin successor employer status under the Act because Ashlin is an employee leasing company which only acquires the employees of a company and because the LALJ found that there was no transfer between the companies of financial assets or other assets such as rolling stock or terminals. After issuing these findings, the LALJ stated the following:

> I find that by merely hiring the employees and by acquiring none of the actual operation, Ashlin did not acquire a distinct and segregable portion of the organization, trade or business, as contemplated by IC 22–4–10–6(b), of Wabash Valley and Atlantic Inland.
>
> The Agency determination finding no successorship is affirmed.

Record at 38. Ashlin appeals the LALJ's decision to deny Ashlin status as a successor employer under the Act. We will state additional facts where necessary.

## DISCUSSION AND DECISION

### Standard of Review

■ " 'Judicial review of an administrative decision is limited to whether the agency possessed the jurisdiction over the subject matter, and whether the agency's decision was made pursuant to proper procedure, was based upon substantial evidence, was not arbitrary and capricious, and was not in violation of any constitutional, statutory, or legal principle.' " *County Department of Public Welfare v. Deaconess Hospital, Inc.* (1992), Ind.App., 588 N.E.2d 1322, 1327, *trans. denied* (quoting *State Bd. of Tax Comm'rs v. Jewell Grain Co.* (1990), Ind., 556 N.E.2d 920, 921). On judicial review, courts defer to an agency's factfinding, provided the findings are supported by substantial evidence. *Id.* However, a court owes no deference to an agency's conclusions of law. *Id.* When the facts are undisputed, and the question is whether those facts lead to a certain conclusion, the case presents a question of law and the courts need not defer to agency decision making. *Id.*

■ "On the other hand, an administrative agency's interpretation of a statute that the agency is charged with enforcing is entitled to great weight; however, an agency's incorrect interpretation of a statute is entitled to

no weight." *Peabody Coal Co. v. Department of Natural Resources* (1992), Ind.App., 606 N.E.2d 1306, 1308. If an agency misconstrues a statute, there is no reasonable basis for the agency's ultimate action and we are required to reverse the agency's decision as being arbitrary and capricious. *Id.* Thus, although the agency interprets its own statute, we are not bound by the agency interpretation. *Id.; Hamilton County Department of Public Welfare v. Smith* (1991), Ind. App., 567 N.E.2d 165, 168.

■ Here, the parties dispute whether the question before us is a pure question of law or a mixed question of law and fact and, thus, whether we are required to afford either minimal or substantial deference to the LALJ's decision under the Act. IDETS asserts that the provision of the Act at issue "cannot be strictly interpreted standing alone but can only be construed in light of its application to a particular factual scenario." Brief of Appellee at 12. However, Ashlin contends that the LALJ's determination that it is not a successor employer was based on an "improper interpretation" of the Act. Reply Brief of Appellant at 6. Because the facts here are undisputed, we are not asked to decide a question of fact; rather, we are asked to apply a statutory provision to undisputed facts. Therefore, the question before us is a pure question of law and the agency interpretation of the Act is not entitled to deference.

### Ashlin's Successor Employer Status

■ We are presented with a question of first impression in Indiana. This case involves Ashlin's partial acquisition of Wabash and Atlantic, specifically Ashlin's acquisition of both companies' truck drivers who were then leased back to those companies, and Ashlin's subsequent request for successor employer status under the Indiana Employment and Training Services Act. Ashlin's status as an "employer" is not in dispute. *See* IND.CODE § 22-4-7-1. Yet, as did the LALJ, we must look to the language of the Act in Indiana Code § 22-4-10-6(b) ("Section 6(b)") to determine whether Ashlin is a successor employer of Wabash and Atlantic.

Under Section 6(b), an employer becomes a successor employer when it:

acquires a *distinct and segregable portion of the organization, trade, or business* within this state of another employer, [and, under such circumstances,] the successor employer shall, upon application and agreement by and between the disposing and acquiring employers, assume the position of the predecessor employer with respect to the portion of the resources and liabilities of the predecessor's experience account as pertains to the distinct and segregable portion of the predecessor's organization, trade, or business acquired by the successor.

(Emphasis added). The Act and the applicable regulations do not provide a definition of the phrase "distinct and segregable portion of the organization, trade, or business" or any of the terms used in that phrase. Thus, the dispositive question we must answer in determining Ashlin's successor employer status is whether the truck drivers of Wabash and Atlantic constitute a "distinct and segregable portion" of those companies' "organization, trade, or business."

■ In construing a statute, our primary task is to give effect to the intent of the legislature. *Spaulding v. International Bakers Services, Inc.* (1990), Ind., 550 N.E.2d 307, 309. When a statute is clear and unambiguous on its face, this court may not interpret the statute; rather, we hold the statute to its clear and plain meaning. *Scheub v. Town of Schererville* (1993), Ind.App., 617 N.E.2d 585, 587. We look to the plain, ordinary meaning of the words and phrases in a statute to discern the legislative intent, although technical words and phrases having a peculiar and appropriate meaning in law shall be understood according to their technical import. *Sheriff's Merit Board v. Peoples Broadcasting Corp.* (1989), Ind., 547 N.E.2d 235, 237; *see* IND.CODE § 1-1-4-1(1). Further, we presume that the legislature intended its language to be applied in a logical manner consistent with the statute's underlying policy and goals. *State Board of Registration v. Nord* (1992), Ind.App., 600 N.E.2d 124, 128. Our supreme court has succinctly described our inquiry as we seek to discover

and carry out the intention of the legislature, as follows:

> '[t]he court will look to each and every part of the statute; to the circumstances under which it was enacted; to the old law upon the subject, if any; to other statutes upon the same subjects, or relative subjects, whether in force or repealed, to contemporaneous legislative history, and to the evils and mischiefs to be remedied.'

*Chicago & Calumet District Transit Co., Inc. v. Mueller* (1938), 213 Ind. 530, 534, 12 N.E.2d 247, 249 (quoting *Barber Asphalt Paving Co. v. Edgerton* (1890), 125 Ind. 455, 460–61, 25 N.E. 436, 437).

### Plain and Ordinary Meaning

Therefore, we begin our analysis by examining the plain and ordinary meaning of the words and phrases at issue in Section 6(b) of the Act, including "distinct and segregable portion" and "organization, trade, or business." *See Nord,* 600 N.E.2d at 129. The "plain, ordinary and usual" meaning of words has been described as that found in everyday speech. *Spangler v. State* (1993), Ind., 607 N.E.2d 720, 723. In order to determine the everyday ordinary and usual meaning of words, courts may properly consult English language dictionaries. *Id.*

■ The terms "distinct" and "segregable," as they are used in Section 6(b), are synonymous. The word "distinct" is defined as "different, separate, plain, well-defined, or clearly perceived." *Webster's New World Dictionary* 409 (2nd ed. 1982); *Black's Law Dictionary* 425 (4th ed. rev. 1968). Likewise, the root of "segregable," segregate, is defined as "separate, isolate, or set apart." *Webster's* at 1290; *Black's* at 1218. Thus, "segregable" means something that is capable of being separated, isolated, or set apart. Finally, the word "portion" means "a part of the whole or a part separated from the whole." *American Heritage Dictionary of the English Language* 1022 (1981).

We must also consider the meaning of the terms in the phrase "organization, trade, or business," which appear in the disjunctive. The definition of "organization" includes "a body of persons organized for some specific purpose, an administrative and functional structure including the personnel of such a structure, or two or more persons having a joint or common interest." *Webster's* at 1002; *Black's* at 991. "Trade" may be defined as "all the persons in a particular line of business or work, or the persons working in or associated with a specified business or industry." *Webster's* at 1506; *American Heritage* at 1360. Further, "business" is defined as "one's work, occupation, or profession, a commercial practice or policy, the buying and selling of commodities and services, or commercial activity engaged in for gain." *Webster's* at 192; *Black's* at 179.

Clearly, the employees or personnel of a company are included within an accepted definition of "organization" or "trade." In addition, employees of a company are a separate and clearly perceived part of an organization, trade or business. Employees add value just as do physical assets and customer good will. A leading text on human resources management described the importance of employees as follows:

> Although plant, equipment, and financial assets are also resources required by organizations, employees, the human resources, are particularly important. Human resources provide the creative spark in any organization. People design and produce the goods and services, control quality, market the products, allocate financial resources, and set overall strategies and objectives for the organization. Without effective people it is simply impossible for an organization to achieve its objectives.

George T. Milkovich & John W. Boudreau, *Human Resources Management* 2 (6th ed. 1991). In other words, trained employees are "assets," if not in a strict accounting sense, then in a practical business sense. Accordingly, employees can fall within the meaning of the phrase "distinct and segregable portion" as it is used in Section 6(b). We conclude, from the foregoing definitions, that when Ashlin acquired the truck driver employees of Wabash and Atlantic, it acquired a "distinct and segregable portion of the organization, trade, or business" of each company according to the plain and ordinary meaning of those words.

We cannot agree with the LALJ's conclusion that the plain and ordinary meaning of Section 6(b) includes the requirement that *"some part of the operation* of the organization, trade or business must be acquired" in order to grant successor employer status. *See* Record at 37 (emphasis added). Although the language of Section 6(b) does not include the word "operation," the LALJ interpreted our decisions in both *Mason v. City Cartage Co.* (1954), 124 Ind.App. 314, 117 N.E.2d 387, and *Astral Industries v. Indiana Employment Security Board* (1981), Ind.App., 419 N.E.2d 192, to hold that such a requirement must be read into the statute. However, neither *Mason* nor *Astral Industries* answers the narrow question presented here.

In *Mason,* we discussed successor employer status in the context of a partial acquisition under the prior version of Indiana Code § 22–4–7–2 containing similar language. However, the term crucial to our resolution of *Mason* was the term "acquires" as it modified "distinct and segregable portion of the organization, trade, or business," and not the phrase "distinct and segregable portion" itself. There was no dispute in *Mason* that Mason had acquired a "distinct and segregable portion of the organization, trade, or business" of the disposing company, City Cartage. On Saturday February 28, 1953, after 30 days notice, City Cartage terminated its unassignable contracts with four freight forwarding companies and with the nine employees who were employed exclusively to service those contracts. The following Monday, March 2, 1953, Mason began a freight pick-up and delivery business and entered into contracts with the same four forwarding companies which had worked with City Cartage. Mason also hired the nine former employees of City Cartage to begin work on the contracts, without a break in employment, on March 2. Mason did not acquire by sale or lease any of the physical assets of City Cartage, which retained its equipment to continue the remaining part of its business.

Under these facts, the Employment Security Board's liability referee found that:

'[u]ndoubtedly the business of the employing unit [Mason] ... after March 2, 1953, was a distinct and segregable portion of the business of City Cartage Company, Inc. prior to March 1, 1953, in the sense that the contracts were with the same forwarding companies and the services performed were substantially the same. Also the employees used in performance of the contracts were the same individuals.'

*Mason,* 117 N.E.2d at 388. Yet, at issue in *Mason* was the referee's denial of successor employer status to Mason because the referee interpreted the term "acquires" in the statute to require privity between the parties, and Mason had not acquired the business directly from City Cartage. We refused to read language into the plain meaning of Section 6(b) which would require privity between the parties and reversed the liability referee's decision. *Id.* at 389. However, we did not express an opinion concerning the referee's finding that Mason had acquired a "distinct and segregable portion of the business of City Cartage," as that was not at issue in *Mason.*

Here, the LALJ interpreted *Mason* to mean that "[t]o be considered a successor [under Section 6(b) ], some part of the *operation* of the organization, trade or business must be acquired." Record at 37 (emphasis in original). Such a construction effectively adds language to the statute which does not exist. While *Mason* gives hypothetical illustrations which seem to find an operational requirement in Section 6(b), those illustrations were used merely to facilitate discussion of the privity question on the facts of that case. An extension of the plain meaning of a statute by the addition of words or phrases encroaches upon the legislative function. *Second National Bank of Danville v. Massey–Ferguson Credit Corp.* (1985), Ind. App., 478 N.E.2d 916, 918. "In construing a statute, it is just as important to recognize what a statute does not say as it is to recognize what it does say." *Irmscher v. McCue* (1987), Ind.App., 504 N.E.2d 1034, 1037. Thus, the dicta of this court in *Mason* does not affect our resolution of the narrow question of law before us in the present case.

In addition, although he acknowledged that it interpreted a different statutory provision than *"Mason* and the present appeal," the

LALJ cited our 1981 decision in *Astral Industries* as providing support for his interpretation of Section 6(b) because it "contains language similar to that in *Mason.*" Record at 37. The LALJ's decision stated the following:

> In describing the assets which an employing unit must acquire in order to become a successor, the Court [of Appeals in *Astral* ] was concerned only with those assets which 'are used in the operation of' the predecessor's trade or business. The 'operation' of Wabash Valley and Atlantic Inland is the organization, trade or business of picking up and delivering things by means of trucks over truck routes. The operation of Wabash Valley and Atlantic Inland is not its personnel. Some portion of the business activity itself must be acquired for there to be a successorship.

Record at 37 (citing *Astral Industries,* 419 N.E.2d at 197). Thus, after applying *Astral Industries* in support of his reading of *Mason,* the LALJ ruled that "by merely hiring the employees and by acquiring none of the actual operation, Ashlin did not acquire a distinct and segregable portion of the organization, trade or business, as contemplated by IC 22–4–10–6(b), of Wabash Valley and Atlantic Inland." Record at 37.

However, in *Astral Industries,* as in *Mason,* we did not interpret the phrase "distinct and segregable portion of the organization, trade, or business." Rather, in *Astral Industries,* the term "asset" in Indiana Code § 22–4–10–6(a) ("Section 6(a)") was at issue. Section 6(a) provides the definition of a "successor employer" as where one "acquires the organization, trade or business, or substantially all the assets of another employer." In other words, successor employer status occurs under Section 6(a) when the entity or substantially all of its assets are acquired by another employer. Because the question here involves a partial transfer, our decision in *Astral Industries* offers us little guidance as to the meaning of any of the terms or the phrase "distinct and segregable portion of the organization, trade, or business." [3]

As in *Astral Industries,* we can find no requirement in the Act or in the decided cases that a part of the business operation or business activity itself must be transferred for the employer to qualify as a successor employer. Although it is not a trucking company like Wabash and Atlantic, Ashlin conducts operations with the same employees it acquired from Wabash and Atlantic and has continued its organization, trade or business without interruption. In other words, the employee acquisitions Ashlin made from Wabash and Atlantic have been utilized in Ashlin's ongoing employee leasing enterprise. The LALJ erred in finding that successor employer status could not be granted unless Ashlin acquired some part of the operation of Wabash and Atlantic.

### Purpose and Policy of the Act

The purpose of the Act and the policy underlying it also support our conclusion re-

---

3. In support of the LALJ's findings, IDETS also contends that we must consider Section 6(b) and Indiana Code § 22–4–7–2(b) ("Section 2(b)") in *pari materia*. Section 2(b), referred to in the text of Section 6(b), describes how an employing unit may become an employer by acquiring "a distinct and segregable portion of the organization, trade, or business" if the "acquisition results in the operation or continuance of an organization, trade, or business." *See* I.C. § 22–4–7–2(b). IDETS maintains that Section 2(b) requires a partial acquisition to result in the operation or continuation of the predecessor's organization, trade, or business before successor employer status may be granted. Brief of Appellee at 18. Thus, IDETS reasons, Section 6(b) must be construed to include the same operational requirement.

As IDETS correctly states, a similar assertion was addressed in *Astral Industries* when we reviewed Sections 2(a) and 6(a) of the Act pertain-

ing to total acquisitions. Similar to the language of Section 2(b), Section 2(a) provides "if the acquisition ... results in or is used in *the operation or continuance of an* organization, trade, or business." (Emphasis added). While we determined that Section 2(a) was of some significance in applying Section 6(a), we limited it to mean only that the "acquisition must be used or result in 'the *operation or continuance of an* organization, trade or business.' " *Id.* at 199 (emphasis in original). Further, we stated there was "nothing in either the language or spirit of the [Act] which requires that the predecessor's *same* business be continued." *Id.* Thus, even when we read Section 2(b) in *pari materia* with Section 6(b), so as to impute a requirement in Section 6(b) that the "acquisition results in the operation or continuance of an organization, trade or business," such a requirement has been met in the instant case.

garding the plain and ordinary meaning of the statutory terms at issue here. The original version of the Act was enacted by the General Assembly in 1947 as the Indiana Employment Security Act. The 1947 Act repealed legislation, known as the Unemployment Compensation Law, which the legislature had enacted on March 18, 1936, in order to implement a state program of unemployment compensation concurrent with New Deal legislation passed by the Congress in August of 1935. *See* Indiana Senate Journal, 1936 Spec.Sess. at 104. Indeed, the 1947 Indiana General Assembly expressly stated the "purpose" of Indiana's unemployment compensation program in former Section 3801 of the Act:

> It is declared to be the purpose of this Act to secure to the State of Indiana and to employers and employees therein all the rights and benefits which are conferred under the Social Security Act of the Congress of the United States, or by any amendment to said Social Security Act or by any Act in lieu thereof enacted by Congress, and to coordinate the provisions of this Act with the provisions of the aforesaid Social Security Act.

The declared purpose of the current version of the Act remains the same as it was in 1947, except that specific provisions of the Social Security Act and other federal laws pertaining to unemployment compensation which affect the Indiana Act are now enumerated.[4]

The intent of Congress in enacting federal unemployment compensation laws, including Title IX of the Social Security Act and the Federal Unemployment Tax Act, "was to provide for the general welfare through the establishment, in advance, of a provident fund for the needy worker by a system of taxation." *Hearst Publications v. U.S.* (D.C.Cal.1946), 70 F.Supp. 666, 670, *aff'd*, 168 F.2d 751 (C.C.A.9 1948). The federal and state unemployment compensation statutes were designed to operate as a "cooperative endeavor" and "to become components of a unitary plan for unemployment relief" in or-

der "to meet a grave emergency problem." *Buckstaff Bath House Co. v. McKinley* (1939), 308 U.S. 358, 363, 60 S.Ct. 279, 281, 84 L.Ed. 322, 325. In addition, the Supreme Court stated in *Buckstaff* that "the purpose of Congress was to have the state law as closely coterminous as possible with its own." *Id.* at 364, 60 S.Ct. at 282, 84 L.Ed. at 326.

To that end, the New Jersey supreme court in 1943 discussed the public policy upon which unemployment compensation legislation is based. The court stated that it "is to achieve social security by affording protection against this greatest hazard of our economic life, involuntary unemployment, which now so often falls with crushing force upon an unemployed worker and his family and constitutes a serious menace to the health, morals, and welfare of the people of the state." *W.T. Grant Co. v. Board of Review of Unemployment Compensation Commission* (1943), 129 N.J.L. 402, 29 A.2d 858, 860. The court further stated that such security is "provided by encouraging employers to provide more stable employment and by the systematic accumulation of funds during periods of employment to provide benefits for periods of unemployment, thus maintaining purchasing power and limiting the serious social consequences of relief assistance." *Id.* 29 A.2d at 860.

Likewise, the public policy underlying the Indiana Act, as it was similarly stated in both the 1936 and the 1947 Acts, is found today in the legislature's "Declaration of Public Policy" in Chapter One of the Act. Generally, that chapter states that the policy of the State of Indiana is to provide its citizens a measure of protection against economic insecurity resulting from unemployment and the hazards associated therewith. *See* IND.CODE § 22-4-1-1. The chapter further provides that the policy is to be exacted under the "police powers" of the state "by the required and systematic accumulation of funds during periods of employment to provide benefits to the unemployed during periods of unemployment and by en-

---

4. Indiana Code § 22-4-37-1 states: "It is declared to be the purpose of this article to secure to the state of Indiana and to employers and employees therein all the rights and benefits which are conferred under the provisions of 42 U.S.C. 501 through 504, 42 U.S.C. 1101 through 1109, 26 U.S.C. 3301 through 3311, and 29 U.S.C. 49 et seq., and the amendments thereto."

couragement of desirable stable employment." *Id.; see Foster v. Review Board of Indiana Employment Security Division* (1981), Ind.App., 421 N.E.2d 744, 746; *see also* Indiana Employment Security Act, ch. 208, § 101, 1947 Ind.Acts 673, 673 (codified as amended at IND.CODE § 22–4–1–1); Unemployment Compensation Law, ch. 4, § 1, 1936 Ind.Acts Spec.Sess. 80, 80 (repealed 1947).

However, because the Act calls for the "systematic accumulation of funds," our supreme court has stated that "the primary purpose of the act is the accumulation and distribution of funds, and not to police or regulate employment." *See* IND.CODE § 22–4–1–1; *Besozzi v. Indiana Employment Security Board* (1957), 237 Ind. 341, 349, 146 N.E.2d 100, 105, *trans. denied.* Thus, the court held that the "function of the act is primarily the exercise of the taxing authority rather than the police power of the state." *Id.* As such, in construing ambiguities in taxing statutes such as the statute at issue here, we will resolve doubts against the taxing power and in favor of the taxpayer. *See Wechter v. Indiana Dept. of State Revenue* (1989), Ind.Tax, 544 N.E.2d 221, 224, *aff'd* (1990), Ind., 553 N.E.2d 844; *Sirloin Saloon v. Dept. of Employment and Training Services* (1989), 151 Vt. 123, 558 A.2d 226, 228 (construing ambiguities in Vermont Unemployment Compensation Law against state and in favor of taxpayer employer who sought successor employer status for partial transfer).

Under the Act, unemployment insurance benefits are funded by a tax contribution imposed upon Indiana employers. While the Indiana Unemployment Insurance Board is ultimately responsible for the state's unemployment insurance program, IDETS is the state agency responsible for the day-to-day administration of the program. In administering the program, IDETS collects unemployment tax contributions from "employing units" which qualify as employers under the Act. The tax contribution is assessed each employer as a percentage of the first $7,000 of wages paid to each employee annually, and the contribution is then credited to an "experience account" established for each employer by IDETS. An employer's experience account is charged when a qualifying employee receives unemployment benefits based upon employment with that employer. The experience account contribution rate for an employer is determined, in part, by the balance in its experience account. Therefore, when a company's employees file more unemployment claims its contribution rate will also increase.

IDETS is responsible for determining the successorship status of an acquiring employer when either a total or partial acquisition occurs between employers, pursuant to Indiana Code § 22–4–10–6(a) and (b) respectively. An employer determined to be a "successor employer" assumes the resources and liabilities of the experience account of the predecessor employer with respect to that portion of the organization, trade or business acquired. The successor employer's contribution rate is then adjusted based upon the new balance in its experience account. If an acquiring employer is denied successor employer status, its experience account balance does not change after the acquisition and the employer's contribution rate is calculated based upon that unchanged balance.

We believe that the purpose of the Act and the public policy underlying the Act are furthered by granting successor employer status to those employers who, in acquiring all or a portion of an ongoing concern, provide continued employment security to those employees and maintain a stable experience account. That conclusion is consistent with the premise of unemployment compensation laws since their inception. The General Assembly has recognized that, in certain situations, the continuation of a predecessor's contribution tax rate is desirable following a transfer of a business or a part thereof when there has been no fundamental change affecting the likelihood of employee lay-offs which would require the state to disburse unemployment compensation benefits. Therefore, in order to discourage unemployment during such transfers, the Act provides an incentive to the successor employer by allowing it to obtain the benefit of the predecessor employer's experience account and contributions, as well as its favorable rate.

Here, Ashlin is an Indiana employer subject to the provisions of the Act. Ashlin acquired the entire truck driving workforce of two companies, Wabash and Atlantic, and provided those employees with continuous, permanent employment without interruption under substantially the same contract terms. Ashlin also assumed all of the two trucking companies' employment responsibilities and obligations owed to their former employees. Moreover, the unemployment compensation fund has not been depleted and Ashlin will continue to make the appropriate contributions. Thus, Ashlin has provided employment security through stable, continuous employment and reduced the risk of unemployment. In short, Ashlin's actions are in furtherance of the legislative intent of the Act.

## CONCLUSION

■ We conclude that where (1) an employer acquires a clearly perceived group or unit of employees, or the entire workforce, of another employer, and (2) the acquiring employer assumes all of the employment responsibilities and provides the employees with continuous, stable employment, those employees constitute a "distinct and segregable portion of the organization, trade, or business" of the predecessor employer under the Act. Here, Ashlin met the statutory requirements. Ashlin's acquisition of the entire truck driving workforce of Wabash and Atlantic falls within the plain and ordinary meaning of the language of Section 6(b). In addition, by its partial acquisition of Wabash and Atlantic, Ashlin promoted stability and continuity of employment and, thus, its actions were in furtherance of the purpose and public policy underlying the Act.

We hold, as a matter of law, that Ashlin is a successor employer within the meaning of the Act. Therefore, we reverse the LALJ's decision and remand this matter to IDETS for further proceedings not inconsistent with this opinion.

The decision is reversed.

BAKER and HOFFMAN, JJ., concur.