Robert Snyder and Associates, Inc., Plaintiff-Appellant,
v. John E. Cullerton, Director of Labor of State of
Illinois, Fred A. Niles Productions, Inc., a Corpora-
tion, Defendants-Appellees.

Gen. No. 50,613.

First District, Third Division.

September 15, 1966.

1

Brown, Fox & Blumberg, of Chicago (Jacob L. Fox and Eugene L. Resnick, of counsel), for appellant.

William G. Clark, Attorney General, of Chicago (Richard A. Michael, A. Zola Groves and John J. O'Toole, Assistant Attorneys General, of counsel), for appellees.

MR. PRESIDING JUSTICE SULLIVAN delivered the opinion of the court.

This is a proceeding brought by the plaintiff under the Administrative Review Act to review an order of the circuit court of Cook County, entered on February 17, 1965, which order affirmed the decision of the Director of Labor who determined that the plaintiff's contribution rate under the Unemployment Compensation Act was 1.6 percent for the year 1960. Kling Film Enterprises, Inc. (Kling) had an unfavorable experience rating record and for rate determination purposes, this record must be charged either to Fred A. Niles Productions, Inc. (Niles), or to the plaintiff. If Kling's record is charged to the plaintiff, it would tend to increase plaintiff's 1960 contribution rate, and if charged to Niles, would tend to increase Niles' rate for that year. The sole issue presented is whether, for unemployment compensation purposes, the unfavorable experience rating record of Kling should be attributable to plaintiff Robert Snyder & Associates, Inc. (Snyder), or to defendant Niles.

The Director of Labor found that the defendant Niles did not succeed to substantially all of the employing enterprises of Kling, and as a consequence, for rate deter-

2

mination purposes, the plaintiff Snyder was charged with the experience rating record of Kling.

It is the plaintiff's theory that the evidence clearly indicates that defendant Niles succeeded to the business interests of Kling, and under the applicable provisions of the Unemployment Compensation Act, should have therefore been charged with Kling's employment experience.

This case involves the construction of paragraph A of section 1507 of the Unemployment Compensation Act (Ill Rev Stats 1963, c 48, par 577) which provides, in material part, as follows:

> "Contribution Rates of Successor and Predecessor Employing Units.) A. Whenever any employing unit succeeds to substantially all of the employing enterprises of another employing unit, then in determining contribution rates for any calendar year, the experience rating record of the predecessor prior to the succession shall be transferred to the successor and thereafter it shall not be treated as the experience rating record of the predecessor, except as provided in Subsection B. For the purposes of this Section, such experience rating record shall consist of all years during which liability for the payment of contributions was incurred by the predecessor prior to the succession, all benefit wages based upon wages paid by the predecessor prior to the succession, and all wages for insured work paid by the predecessor prior to the succession, on which contributions have been paid."

On October 13, 1958, Kling, a corporation engaged in making commercial films for television and industrial use, sold its tangible personal property to defendant Niles, a corporation engaged in a similar business. Defendant operated its business at 22 West Hubbard Street, Chicago, and Kling operated from leased premises at 1058 Wash-

3

ington Boulevard, Chicago. Kling was a wholly owned subsidiary of the plaintiff until Kling was dissolved. Thereafter, the remaining assets and liabilities were distributed to the plaintiff in 1962. By virtue of the sale, the defendant assumed the lease of the Kling premises, and Kling agreed that it would not engage in the business of making commercial films for a period of 15 years following the date of the sale.

The purchase price of approximately $350,000 was payable $2,000 upon the consummation of the contract and the balance in annual installments. The sale was consummated on October 13, 1958, by the transfer to Niles of all of the tangible assets and leasehold improvements owned by Kling and used by it in its business, and the assignment to Niles of Kling's lease. Niles also took over Kling's telephone number since it could not transfer its Hubbard Street telephone number to the Washington Boulevard studio.

The tangible assets of Kling immediately prior to the sale consisted of cameras, lighting equipment, sound recording devices, and the related equipment and leasehold improvements required to synchronize and record image and sound on film. These assets, which cost Kling $452,302 and had a depreciated value on its books of $204,722, were all sold to Niles. Kling retained its cash, accounts receivable, certain prepaid items, and its investments in other companies, which had a value on Kling's books of approximately $258,000.

At the time of the purchase Niles had tangible assets carried on its books at a value of approximately $117,063. The effect of the purchase was to increase the value of Niles' tangible assets to approximately $469,295.

According to the testimony of Fred A. Niles, principal owner of Niles, Niles purchased no goodwill from Kling, nor the right to use its corporate name, because Niles did not want to be identified in any way with Kling. Kling's record was such that any connection with Kling

4

could mean trouble for Niles. It was agreed that Kling's unfinished work would be completed by Niles but it was stipulated that Kling would bill the customers for the work and they would pay Kling. Niles' sole interest was in the expansion of its own business. Consequently, Niles wanted only Kling's facilities, its studio and its equipment.

At the time of the sale Kling had a library of film negatives, accumulated over a period of ten years. These negatives are owned by the customer but customarily retained by the studio. Niles agreed to retain custody of these negatives accumulated by Kling. The business from these negatives was very insignificant, and never exceeded 3% of the total business of Kling. Consequently, retention of these negatives was no assurance that Niles would receive any additional business.

Prior to October 13, 1958, Kling employed approximately 60 persons. Kling reduced its work force so that at the time of sale it had 43 employees on its payroll. The President of Niles, in negotiations with Kling, stated that Niles had "plenty of personnel" and had no need for Kling employees. Niles informed Kling that Niles would not agree to hire any of Kling's employees, but that Niles would consider former employees if they were free agents and could be used by Niles. Fifteen of Kling's employees were employed by Niles for varying periods of time. On October 13, 1958, four were hired by Niles—two secretaries, a set painter, and an electrican. Prior to October 13 three of Kling's employees were hired by Niles. After October 13 seven persons who had been employed by Kling were hired by Niles. One of them worked for Niles for three days. Four of those hired worked for Niles for periods ranging from one to three weeks. Four of the persons hired were employed to work on the jobs which Niles was completing for Kling. Kling released those employees not taken on by Niles at the time of sale or shortly thereafter.

5

The plaintiff contends that the transaction between Fred A. Niles Productions, Inc. and Kling Film Enterprises, Inc. was a succession by the former to "substantially all of the employing enterprises" of the latter, as that phrase is used in section 1507 of the Unemployment Compensation Act and as it has been interpreted by the courts.

To understand the nature of the controversy in the instant case it would be well to set forth the method by which contribution rates are established for employers under the provisions of the Unemployment Compensation Act.

The Act provides for the accumulation of reserves during periods of employment to be used to pay benefits to workers during periods of unemployment. (Ill Rev Stats 1963, c 48, par 300.) To provide funds to pay unemployment compensation benefits, the Act imposes upon employers an obligation to pay a certain percentage of their payroll into the unemployment trust fund of this State. For the year 1960, these rates ranged from 0.1 percent to 4.0 percent. Employers who have histories of unstable employment tend to have higher contribution rates, and those who have histories of stable employment tend to have lower contribution rates.

Section 1507 of the Act authorizes the transfer of an employer's experience rating to another only in cases where there has been a succession to substantially all of the employing enterprises of the predecessor employer. If the successor did not succeed to substantially all of the employing enterprises of the predecessor, the predecessor retains its experience rating record.

This court is obliged to upheld the decision of the Director of Labor with regard to plaintiff's 1960 contribution rate unless it is clearly and manifestly against the weight of the evidence. (Ill Rev Stats 1963, c 48, par 703; c 110, par 274.) Under the statutory provisions the burden is on the plaintiff to establish that the Director's

6

decision is incorrect. The Supreme Court of this State has stated that the finding of fact and decision of the Director of Labor will not be disturbed unless manifestly against the weight of the evidence or unless not substantiated by the evidence in the record. (Spahn v. Department of Labor, 25 Ill2d 482, 185 NE2d 231; Myers v. Cummins, Director of Labor, 9 Ill2d 582, 138 NE2d 491.)

Both parties to this appeal agree that in determining whether Kling's experience should be transferred to Niles, it is important to ascertain and to give effect to the legislative intent in enacting section 1507(A). Prior to July 1, 1941, the Unemployment Compensation Act contained no provision for the transfer of employment experience. Recognizing the need for such a provision, the legislature enacted section 18(c)(6) which provided:

> ". . . For the purpose of this subsection two or more employing units which are parties to or the subject of a merger, consolidation, or other form or reorganization effecting a change in legal identity or form shall be deemed to be a single employing unit for the purpose of computing contribution rates, if the Director finds that (a) immediately after such change the employing enterprises of the predecessor employing unit or units are continued solely through a single employing unit as successor thereto, and (b) immediately after such change such successor is owned or controlled by substantially the same interests as the predecessor employing unit or units. . . ." (Ill Rev Stats 1941, c 48, par 234.)

On July 1, 1943, section 18(c)(6) was amended so that subsection (A)(b) of the section read: ". . . (b) immediately after such change such successor is owned or controlled, directly or indirectly, by legally enforceable means or otherwise, by the same interests as the predecessor employing unit or units immediately preceding

7

the date of reorganization . . . ." (Ill Rev Stats 1943, c 48, par 234.) Under each of these amendments the employing experience of a predecessor was passed to a successor only if the latter was "owned or controlled" by the same interests as the predecessor.

The Board of Unemployment Compensation and Free Employment Office Advisors was created by statute to study unemployment compensation, and to give recommendations to the Governor and General Assembly. On April 25, 1945, said board submitted a report to the Governor and the Sixty-Fourth General Assembly which recommended that the language of section 18(c)(6) which provided that the predecessor and successor employing units involved therein "should be considered and treated as a single employing unit" should be modified so as to set forth the rights and obligations of the parties with greater clarity and that the requirement of common ownership and control should be eliminated.

The report stated that under the then present provisions when an employer has earned a specific rate and sells the business to another employing unit, the purchaser does not secure the employment experience of the seller unless the purchaser's business was continued solely through the seller, and the purchaser and seller units were owned or controlled by the same interests.

The board recommended an amendment to section 18 (c)(6) to remove the requirement that the predecessor and successor units be owned or controlled by the same interests, in order to qualify for a variable rate. The report stated: "The purchaser of a *business* ordinarily takes over all of the rights and liabilities of the seller, even though the two businesses are not controlled by the same interests. The present provisions are inconsistent with this concept, since they were based upon the theory that employment experience is a factor personal to the individuals who control a business. The Advisory Board was of the opinion that this theory is not entirely correct

8

and that the nature of the business and the circumstances under which it functions are of major importance in the transfer of its employment experience. For this reason it is logical that the business should retain such experience despite changes in ownership. . . ." (Emphasis added.)

The board was of the opinion that the variable rate should be allowed to the successor *when he takes over substantially all of the predecessor's business;* the inflexible nature of the requirement that the predecessor business be "continued solely through" the successor caused many inequities and administrative difficulties. The board stated that "the phrase 'substantially all' would accomplish the same results as the phrase 'continued solely through' and that . . . the former is more adaptable to the furtherance of the legislative intent."

We must here note that nowhere in the report or recommendations of the board was it concerned with a mere transfer of assets, and no mention was made of assets. The board wanted to provide for the transfer of employment experience when the successor took over "subsequently all of the predecessor's business."

The recommendations of the board were adopted by the Legislature on June 7, 1945, in Senate Bill 361, and the bill was approved by the Governor on June 30, 1945. (Session Laws 1945, pp 767, 791, 792.) Section 18(c) (6) was thereby amended to incorporate the changes previously referred to. Section 18(c) (6) was renumbered section 1507(A) in 1951, (Ill Rev Stats 1951, c 48, par 577) and in all respects the statute remains the same today. (Cited supra.)

The plaintiff argues that the legislative history of section 18(c) (6) demonstrates that the Legislature broadened the coverage of the section when the requirement that there be a succession to "the employing enterprises" was changed in 1945 to "substantially all of the employing enterprises" and the requirement that the successor

9

be owned or controlled by substantially the same interests as the predecessor was deleted.

We do not agree with this argument by the plaintiff. A review of the history of this section of the Unemployment Compensation Act reveals no intent on the part of the Legislature to broaden the coverage of the Act. The Advisory board specifically stated that the phrase "substantially all" would accomplish the same results as the phrase "continued solely through." The phrase "substantially all" was inserted into the section to remedy the inflexibility of the requirement that the predecessor business be "continued solely through" the successor. In view of the history of the section, the argument of the plaintiff relative to the 1945 amendment is entirely unrelated to the legislative intent in enacting this amendment. The history of section 1507 (A) speaks for itself. It demonstrates that the intent of the Legislature was to permit a transfer of the predecessor's experience rating record to a successor only when there has been a succession to substantially all of the predecessor's business as a going business.

■ The use of reports of a statutory board is justified when the legislative body adopts the views embodied therein, and enacts them into law. Sutherland Statutory Construction, 3rd Ed, Vol 2, § 5006, pp 491–493, § 5010, pp 498, 499; Moran v. Bowley, 347 Ill 148, 155, 179 NE 526.

The plaintiff argues that the case of Ekco Products Co. v. Cummins, 5 Ill2d 307, 125 NE2d 526, is very similar to the instant case. There the predecessor (Minute Mop) manufactured and sold patented cleaning devices. The successor (Ekco) purchased Minute Mop's machinery and equipment, inventories of finished goods and work in process, corporate name, goodwill, patent rights, licenses, trademarks, brands and trade names. Minute Mop also turned over to Ekco the manufacturing, processing, scientific, and technical data, records and drawings, lists

10

of customers, sales correspondence, books of accounts, price lists, together with the other records and advertising materials used in its business. The factory building was subleased to Ekco. In order to continue the operations of Minute Mop, Ekco hired 61 of 65 Minute Mop employees. These employees continued to work on the same premises and in the same capacities after an orderly and uninterrupted changeover of management.

Ekco contended that it had not succeeded to substantially all of the employing enterprises of Minute Mop since approximately 75% of its predecessor's employment producing assets were retained by Minute Mop. The Supreme Court rejected this contention and pointed out that Ekco had acquired the patent rights, licenses, lists of customers, trademarks, and corporate name of Minute Mop. The court considered it important that immediately after the sale, 61 of the 65 Minute Mop employees (93%) became employees of Ekco and continued in the same capacities. Also, the assets acquired from Minute Mop accounted for 97½ percent of its sales.

It is apparent that the important facts in the Ekco case are quite dissimilar from those in the instant case. Rather than supporting the plaintiff, this case actually supports the decision of the Director of Labor. A comparison of the items transferred in Ekco to those transferred in the instant case is enlightening:

|  | Disposition in Ekco | Disposition in this case |
|---|---|---|
| Manufacturing equipment and machinery | Transferred | Transferred |
| Office equipment | Transferred | Transferred |
| Corporate name | Transferred | Not transferred |
| Inventories | Transferred | Not present |
| Covenant not to compete | Given | Given |
| Possession of premises | Transferred | Transferred |
| Good Will | Transferred | Not transferred |

11

|  | Disposition in Ekco | Disposition in this case |
|---|---|---|
| Work in Progress | Transferred | Not transferred |
| Patent Rights | Transferred | Not transferred |
| Licenses | Transferred | Not transferred |
| Trademarks | Transferred | Not transferred |
| Trade Names | Transferred | Not transferred |
| Technical Data | Transferred | Not transferred |
| Lists of Customers | Transferred | Not transferred |
| Sales Correspondence | Transferred | Not transferred |
| Books of Accounts | Transferred | Not transferred |
| Employees Transferred | 61 out of 65 | (See below) |

Insofar as the number of employees transferred to Niles, the plaintiff argues that 15 out of 43 were hired by Niles, while the defendants contend that only 4 out of 60 were actually employed by Niles as a direct result of the sale. The facts reveal that prior to the sale Kling employed 60 persons, but reduced this number to 43 at the time of the sale. Of these 15 worked for Niles subsequent to the sale. Of these 3 were already working for Niles prior to October 13, 1958, and therefore cannot be considered a part of the sale in question. Of the remaining 12 persons, 8 were first employed by Niles on October 20, 1958, and shortly thereafter. Their employment came about after Niles was in possession of the purchased premises, and obviously had nothing to do with the transfer. The remaining 4 persons (representing approximately 9 percent of Kling's final production payroll) were acquired by Niles at the time of the transfer.

In terms of employees acquired, it is obvious that Niles did not acquire "substantially all." The previous comparison of the items transferred in the instant case with those transferred in Ekco also reveals that the sale to Niles consisted essentially of physical assets.

The Ekco case distinguished between the New Hampshire statute which uses the term "assets" and the Illinois statute which uses "employing enterprises." The court did not deny the validity of assets as one of the criteria to be used in an analysis of "employing enterprises," but said at page 315:

"In enacting section 1507 the General Assembly based the transfer of employment experience upon a succession to a going business, a commercial or industrial project or undertaking *responsible for giving employment to workers, and not merely upon a succession to assets*. Factors most directly related to furnishing employment will necessarily vary with different businesses, but the value of assets, alone, will rarely constitute the sole basis for determining the capacity of a business for furnishing employment." (Emphasis added.)

In the Ekco case the transition which occurred by virtue of the change in ownership was orderly; orders were filled and sales were made without interruption. After the sale assets acquired by Ekco from Minute Mop accounted for 97½ percent of its sales. These assets included Minute Mop's corporate name, goodwill, patent rights, inventory of finished goods, licenses, trademarks, trade names, technical data, books of accounts, list of customers, price lists, and various records of Minute Mop. This is in sharp contrast to what happened in the instant case. The above mentioned assets were not transferred, there was not an orderly transition, and sales were not made by Niles to customers of Kling.

Plaintiff states in its brief that: "the real test is whether the capacity for furnishing or providing employment is transferred. . . ." A necessary corollary of this reasoning would be that for an enterprise or asset to be

an employment producing one, it would actually have to produce some employment. There is no evidence in the instant case that Kling's enterprises or assets actually produced any such result after their transfer to Niles.

In the Ekco case the court stated at page 315: "It appears, however, that while Ecko disavows an interpretation of the phrase 'employing enterprise' as meaning solely the dollar value of assets, its argument approaches that position." Similarly in the instant case, while plaintiff may disavow an interpretation of his argument that "employing enterprises" means assets, his argument actually approaches that position when he contends that Niles should be charged with Kling's experience rating solely on the basis of a succession to physical assets. This argument was rejected by the court in Ekco, supra, and is rejected in the instant case.

■ We find that the decision of the Director of Labor is not contrary to the manifest weight of the evidence, and the plaintiff, Robert Snyder and Associates, Inc., was correctly charged with the experience rating record of Kling Film Enterprises, Inc.

Affirmed.

SCHWARTZ and DEMPSEY, JJ., concur.