**INDIANAPOLIS CONCRETE, INC., Appellant,**

v.

**UNEMPLOYMENT INSURANCE APPEALS OF the INDIANA DEPARTMENT OF WORKFORCE DEVELOPMENT, Appellee.**

No. 93A02–0806–EX–474.

Court of Appeals of Indiana.

Jan. 29, 2009.

Sean M. Clapp, Fishers, IN, Attorney for Appellant.

Gregory F. Zoeller, Attorney General of Indiana, Elizabeth Rogers, Deputy Attorney General, Indianapolis, IN, Attorney for Appellee.

**OPINION**

BROWN, Judge.

Indianapolis Concrete, Inc., appeals the decision of a Liability Administrative Law Judge ("ALJ") concluding that Indianapolis Concrete was a successor employer of Indy Concrete, Inc., for purposes of calculating its contribution to the Unemployment Insurance Benefit Fund ("Fund"). Indianapolis Concrete raises one issue, which we revise and restate as whether the ALJ erred as a matter of law in his conclusion that Indianapolis Concrete is a successor employer of Indy Concrete, Inc., under Ind.Code § 22–4–10–6. We reverse.

The relevant facts follow. William Lakeman worked as a foreman and supervisor for Indy Concrete, Inc., an Indiana corporation owned by William's brother Larry Lakeman and Larry's wife Melissa. During the fourth quarter of 2005, Indy Concrete had twenty-five employees. In September 2005, Larry died, and William and Melissa attempted to run Indy Concrete together. A few weeks later, however, Melissa "shutdown" Indy Concrete. Transcript at 8. At that time, Indy Concrete had no jobs in progress. Within a week after the dissolution of Indy Concrete, William formed Indianapolis Concrete as the sole owner.[1]

William opened new bank accounts for Indianapolis Concrete. Indy Concrete owed William $13,000 in back wages, and, in payment of the debt, William received Indy Concrete's telephone number, two trucks, a trailer, several water pumps, trowel machines, and other equipment, which William used in the new business. William also provided his own equipment and leased further equipment as well as ten vehicles. Indianapolis Concrete did not take Indy Concrete's computers or office equipment or conduct business from Indy Concrete's office. Indianapolis Concrete did not use Indy Concrete's goodwill but did acquire two of Indy Concrete's clients.

On its first day of operations, Indianapolis Concrete hired five of Indy Concrete's former employees, who were out of work because of Indy Concrete's dissolution, and, within six weeks, had hired a total of eighteen former employees. At present, Indianapolis Concrete has forty-seven employees, and, like Indy Concrete, works mainly in concrete finishing, although, compared to Indy Concrete, its work is "more diverse." *Id.* at 12.

On May, 22, 2007, the Indiana Department of Workforce Development ("the Department") issued a notice of complete disposition of business to Indianapolis Concrete, stating that Indianapolis Concrete had been determined to be a successor employer of Indy Concrete and had therefore assumed Indy Concrete's unemployment compensation experience balance and tax rate. Indianapolis Concrete protested this determination, and, after a hearing, the ALJ issued findings of fact and conclusions thereon concluding that:

> [A]lthough [William] specifically stated that he had no intention of continuing the operation of the disposer, and does not believe that he did, under Indiana unemployment law, the facts of the shutdown of [Indy Concrete], and the beginning of the operation of [Indianapolis Concrete] resulted in a transfer which constituted a full successorship [sic] under Indiana unemployment law.

Appellant's Appendix at 6.

The sole issue is whether the ALJ's conclusion that Indianapolis Concrete is a successor employer of Indy Concrete, Inc., under Ind.Code § 22–4–10–6 is correct as a matter of law. The Indiana Unemployment Compensation Act provides that "[a]ny decision of the liability administrative law judge shall be conclusive and binding as to all questions of fact." *Bloomington Area Arts Council v. Dep't of Workforce Dev., Unemployment Ins.App.,* 821 N.E.2d 843, 849 (Ind.Ct.App.2005) (quoting Ind.Code § 22–4–32–9(a)). When the ALJ's decision is challenged as con-

---

1. In his findings, the ALJ stated that William started Indianapolis Concrete "[w]ithin approximately one week after his brother's death." Appellant's Appendix at 4. This finding is without support in the record, which reveals that William formed Indianapolis Concrete within a week after the dissolution of Indy Concrete, an event that occurred several weeks after Larry died. *See* Transcript at 7–9.

trary to law, we are limited to a two-part inquiry into the "sufficiency of the facts found to sustain the decision" and the "sufficiency of the evidence to sustain the findings of facts." *Id.* (quoting Ind.Code § 22–4–32–12). Under this standard, basic facts are reviewed for substantial evidence, conclusions of law are reviewed for their correctness, and ultimate facts are reviewed to determine whether the ALJ's finding is a reasonable one. *Id.* (citing *McClain v. Review Bd. of Ind. Dep't of Workforce Dev.*, 693 N.E.2d 1314, 1318 (Ind.1998). *reh'g denied* ). Ultimate facts are conclusions or inferences from the basic facts. *Id.* (citing *McClain,* 693 N.E.2d at 1317).

Under the Indiana Employment and Training Services Act,[2] unemployment insurance benefits are funded by a tax contribution imposed upon Indiana employers. *Ashlin Transp. Serv., Inc. v. Ind. Unemployment Ins. Bd.*, 637 N.E.2d 162, 171 (Ind.Ct.App.1994). Each year, the Department determines the contribution rate applicable to each employer, and the contribution is then credited to an "experience account" established for each employer by the Department. Ind.Code §§ 22–4–11–2(a), 22–4–11–2(e). An employer's experience account is charged when a qualifying employee receives unemployment benefits based upon employment with that employer. *Ashlin,* 637 N.E.2d at 171. The experience account contribu-

tion rate for an employer is determined, in part, by the balance in its experience account. *Id.* Therefore, when a company's employees file more unemployment claims, its contribution rate will also increase. *Id.*

The Department is responsible for determining the successorship status of an acquiring employer when either a total or partial acquisition occurs between employers, pursuant to Ind.Code § 22–4–10–6(a), discussed *infra*, and (b)[3] respectively. *See id.* An employer determined to be a "successor employer" assumes the resources and liabilities of the experience account of the predecessor employer with respect to that portion of the organization, trade or business acquired. *Id.* The successor employer's contribution rate is then adjusted based upon the new balance in its experience account. *Id.* If an acquiring employer is denied successor employer status, its experience account balance does not change after the acquisition and the employer's contribution rate is calculated based upon that unchanged balance. *Id.*

Ind.Code § 22–4–7–2(a) defines an "employer" as:

> Any employing unit whether or not an employing unit at the time of the acquisition which acquires the organization, trade, or business within this state of another which at the time of such acquisition is an employer subject to this

---

2. Ind.Code §§ 22–4–1–1 et seq.

3. Ind.Code § 22–4–10–6(b) governs employers who acquire "a distinct and segregable portion of the organization, trade, or business ... of another employer." The word "distinct" is defined as "different, separate, plain, well-defined, or clearly perceived." *Ashlin,* 637 N.E.2d at 167. Likewise, the root of "segregable," segregate, is defined as "separate, isolate, or set apart." *Id.* Thus, "segregable" means something that is capable of being separated, isolated, or set apart. *Id.* Finally, the word "portion" means "a part of

the whole or a part separated from the whole." *Id.* In *Ashlin,* for example, we held that, under Ind.Code § 22–4–10–6(b), one employer acquired a distinct and segregable portion of the organization, trade, or business of another employer where the employer acquired the truck driver employees of two other employers. *See id.* In the present case, as there was no evidence presented that Indianapolis Concrete acquired a distinct and segregable portion of Indy Concrete, we will confine our analysis to Ind.Code § 22–4–10–6(a).

article, and any employing unit whether or not an employing unit at the time of the acquisition which acquires *substantially all the assets* within this state of such an employer used in or in connection with the operation of such trade or business, if the acquisition of substantially all such assets of such trade or business results in or is used in the operation or continuance of an organization, trade, or business.

(Emphasis added). Ind.Code § 22–4–10–6(a) provides:

When:

(1) an employing unit (whether or not an employing unit at the time of the acquisition) becomes an employer under IC 22–4–7–2(a);

(2) an employer acquires the organization, trade, or business, or *substantially all the assets* of another employer; or

(3) an employer transfers all or a portion of the employer's trade or business (including the employer's workforce) to another employer as described in IC 22–4–11.5–7; [4]

the successor employer shall, in accordance with the rules prescribed by the department, assume the position of the predecessor with respect to all the resources and liabilities of the predecessor's experience account.

(Emphasis added).

Indianapolis Concrete argues that it did not acquire all or substantially all of Indy Concrete's assets and, thus, cannot be a successor employer under Ind.Code § 22–4–10–6. We have not yet had the occasion to define the phrase "substantially all the

assets." In *Astral Indus., Inc. v. Ind. Emp. Sec. Bd.*, we noted that "the word 'substantially' . . . does not indicate a definite, fixed amount of percentage but is an elastic term which must be construed according to the facts of the particular case." 419 N.E.2d 192, 197 (Ind.Ct.App.1981) (quoting *Harris v. Egan*, 135 Conn. 102, 60 A.2d 922, 925 (1948)). We also noted that "a prime question in determining whether substantially all of the assets [were acquired] . . . is: Did the acquisition result in a substantial continuation of the same or like business?" *Id.* (quoting *Harris*, 60 A.2d at 925). However, in *Astral*, we considered only the narrow issue of whether accounts receivable constituted assets under the predecessor to the current statute and did not address the question of when one employer has acquired substantially all the assets of another. *See id.* at 198 (holding that the Referee correctly refused to consider accounts receivable in determining that the appellant had acquired substantially all of another employer's assets).

In determining whether one employer has acquired substantially all of the assets of another, other courts have considered several factors, including acquisition of: (1) manufacturing equipment and machinery; (2) office equipment; (3) corporate name; (4) inventories; (5) covenants not to compete; (6) possession of premises; (7) good will; (8) work in progress; (9) patent rights; (10) licenses; (11) trademarks; (12) trade names; (13) technical data; (14) lists of customers; (15) sales correspondence; (16) books of accounts; and (17) employees transferred. *See Robert Snyder & Assocs., Inc. v. Cullerton*, 75 Ill. App.2d 1, 221 N.E.2d 148, 154 (1966); *see also Imprint Techs., Inc. v. Comm'r of*

---

**4.** Ind.Code § 22–4–11.5–7 applies to a transfer of a trade or business between two employers who have "substantially common ownership, management, or control." Ind. Code § 22–4–11.5–7(a)(2). As there was no

evidence presented that Indy Concrete and Indianapolis Concrete had substantially common ownership, management, or control, this section does not apply to the present case.

*Econ. Sec.,* 535 N.W.2d 372, 376 (Minn.Ct. App.1995); *Pee Dee Nursing Home, Inc. v. S.C. Emp. Sec. Comm'n,* 303 S.C. 232, 399 S.E.2d 777, 779 (1990); *Riteway Oil & Gas Co., Inc. v. Iowa Dep't of Job Serv.,* 423 N.W.2d 550, 551 (Iowa 1988).

In the present case, the record reveals that Indianapolis Concrete was formed one week after the dissolution of Indy Concrete. Indianapolis Concrete hired five of Indy Concrete's twenty-five former employees, who were out of work at that time, and, within six weeks, had hired a total of eighteen former employees. William acquired certain of Indy Concrete's assets, including its phone number, two trucks, a trailer, water pumps, trowel machines, and other items, which he used in the new business. William also supplied his own equipment and leased further equipment as well as ten vehicles. Like Indy Concrete, Indianapolis Concrete works mainly in concrete finishing, although its work is "more diverse." Transcript at 12. Indianapolis Concrete also acquired two of Indy Concrete's clients. On the other hand, at the time of its dissolution, Indy Concrete had no ongoing projects, and Indianapolis Concrete did not acquire Indy Concrete's premises, office equipment, computers, bank accounts, or good will. Furthermore, William testified that Indy Concrete had a "bad reputation" and that, in forming Indianapolis Concrete, he wanted to "distance [him]self" from it. *Id.* at 16.

In light of the above factors, we conclude that Indianapolis Concrete did not acquire substantially all of the assets of Indy Concrete. Rather, it acquired assets from which it built a new business.

*See Snyder,* 221 N.E.2d at 155 (holding that Nile was not a successor employer of Kling where Nile acquired Kling's manufacturing equipment and machinery, office equipment, premises, and some of Kling's employees, but did not acquire the corporate name, inventories, good will, work in progress, patent rights, licenses, trademarks, trade names, technical data, customer lists, sales correspondence, and books of accounts); *Riteway,* 423 N.W.2d at 551 (holding that there was no continuity of business where Riteway did not acquire Koch's customer lists, good will, trade name, most of its employees, or brand name, but did acquire its inventory and place of business); *cf. Imprint,* 535 N.W.2d at 377 (holding that Imprint acquired the "organization, trade, or business" of Workforce where Imprint acquired Workforce's corporate and trade names, phone number, goodwill and customers, maintained a location across the street from Workforce, acquired eight of Workforce's twelve employees, attempted to buy "most if not all" of Workforce's assets, and where the sole director and officer of Imprint was the president of Workforce and on its board of directors); *Pee Dee,* 399 S.E.2d at 779 (holding that Pee Dee was the successor employer of CSFR where Pee Dee "continued uninterrupted the patient-care operation from [CSFR's] place of business, initially retained more than 95% of CSFR's employees, all of CSFR's patients, patient records, its trade name, inventory and equipment"). We hold, therefore, that the ALJ's conclusion that Indianapolis Concrete is the successor employer of Indy Concrete was incorrect as a matter of law.[5]

5. Indianapolis Concrete also argues that "[t]here was absolutely no evidence that [it] 'took over' certain assets of [Indy Concrete]. There was no contract between [it] and Indy whatsoever." Appellant's Brief at 10. Because we hold that Indianapolis Concrete did not acquire substantially all of Indy Concrete's assets, we need not address this argument.

For the foregoing reasons, we reverse the ALJ's conclusion that Indianapolis Concrete is the successor employer of Indy Concrete.

Reversed.

ROBB, J. and CRONE, J. concur.