

FILED
Sep 21 2015, 9:27 am

CLERK
of the supreme court,
court of appeals and
tax court

ATTORNEY FOR APPELLANT

Zachary J. Eichel
Einterz & Einterz
Zionsville, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| D & D NAPA, Inc., <br><br> *Appellant*, <br><br> v. <br><br> Unemployment Insurance Appeals of the Indiana Department of Workforce Development, <br><br> *Appellee*. | September 21, 2015 <br><br> Court of Appeals Case No. 93A02-1501-EX-58 <br><br> Appeal from the Department of Workforce Development Unemployment Insurance Appeals <br><br> The Honorable Aija Funderburk, Liability Administrative Law Judge <br><br> Case No. 58171 |

**Brown, Judge.**

[1] D & D NAPA, Inc. (D & D Metal Products, Inc.) ("D & D")[1] appeals a decision of the Liability Administrative Law Judge (the "ALJ") concluding that it was a partial successor of Chaffins Enterprises, Inc. ("Chaffins") for the purpose of calculating its unemployment benefit contributions. D & D raises one issue, which we revise and restate as whether the ALJ erred as a matter of law in its conclusion. We affirm.

## *Facts and Procedural History*

[2] D & D sells automotive parts supplied by NAPA Auto Parts and operates sixteen stores in Illinois and Indiana. In May 2010, D & D purchased certain property from Chaffins for approximately $38,077.29. According to the bill of sale, D & D purchased "[a]ll currently classified stock-in-trade, merchandise and inventories of [Chaffins's] store, totaling [$20,798.29[2]] or the value as physically inventoried prior to the closing" and "[t]he furniture, fixtures, and

---

[1] At the October 14, 2014 hearing, Roger Dittrich indicated he was the president of D & D and that the company changed its name from D & D Metal Products, Inc., to D & D NAPA, Inc.

[2] The bill of sale initially showed an amount of $75,000, but the amount was struck and the handwritten amount of $20,798.29 was inserted. Dittrich, the president of D & D, testified that the initial amount was based on information he was given regarding the inventory level, that at the time of purchase a physical inventory was completed and the actual number was $20,798.29, and that a person with NAPA's corporate office inserted the handwritten figures on the bill of sale.

miscellaneous equipment used in [Chaffins's] store . . . totaling [$17,279[3]]." Exhibits at 90.

[3] In February 2013, Chaffins filed a Report of Inactivation with the Indiana Department of Workforce Development (the "DWD") stating that it had discontinued operations and that the date of its last payroll was on September 30, 2011. In March 2013, Chaffins filed the completed form "Report of Transfer – Complete Sale" with the DWD. Exhibits at 53. In the area to specify the reason for filing the form, the box next to "Other" was marked, and the explanation stated "lease of building" and "purchase of retail business."[4] *Id.* Chaffins indicated that the effective date of the change and the date its operations ceased was April 23, 2010, and that the date of its last payroll was April 24, 2010.

[4] On July 5, 2013, the DWD issued a notice that it made a determination that there had been a complete disposition to acquirer as of December 31, 2010.[5]

---

[3] The bill of sale initially showed an amount of $16,509, but the amount was struck and the handwritten amount of $17,279 was inserted.

[4] In addition to "Other," the options included, among others, "Sale of Complete organization" and "Partnership change (50% or more)." Exhibits at 53.

[5] The DWD presented testimony that Chaffins submitted a contribution report indicating it had "payroll, one employee on the twelfth of the month through the fourth quarter of 2010," that the DWD had "a lot of dates being used by Chaffins and no [] tangible information received from [D & D]," and that the DWD could not hold that the disposition occurred any earlier than December 31, 2010 "because the employer told [it] that through the twelfth day of December 2010 at a minimum they had one employee working." Transcript at 57.

The DWD recalculated D & D's employer rate to reflect the acquisition of Chaffins, resulting in a rate increase for D & D for 2012.

[5]     On September 10, 2013, the DWD sent notice and demand statements to D & D for each of the four quarters in 2012.[6]  Specialized Accounting Services LLC ("SAS"), on behalf of D & D, sent a letter dated September 13, 2013, to the DWD stating: "Although [Chaffins] ceased its operations and is closed, [D & D] did NOT acquire this business.  D & D simply purchased the assets of the business and hired the employees." *Id.* at 59.  SAS sent a letter dated October 15, 2013, to DWD stating that D & D did not purchase Chaffins and that it "merely purchased the remaining assets after it was closed (the assets were $200k) and did not even hire any of the prior employees." *Id.* at 70.  The letter also stated that D & D had acquired the assets and employees of another company in 2012, that the company had a much better experience rating with the State, and that it was expected that the information would help lower D & D's rate for 2013.

[6]     On October 14, 2014, a hearing was held before the ALJ at which the parties appeared by counsel and presented testimony and evidence.  The DWD presented the testimony of Jennifer Chappell, Director of U.I. Tax Administration for DWD, and Mary Lisa Bickley and Dawn Bottoms, audit examiners for DWD, and D & D presented the testimony of Roger Dittrich,

---

[6] The sum of the amounts due on the four statements is $6,391.

President of D & D. The ALJ admitted documentary evidence which included the report of transfer, records of telephone inquiries, employee wage detail reports, correspondence from SAS, the notice and demand statements, printouts of employer rate detail screens, experience balance reconciliation worksheets, and the bill of sale. According to a record of telephone inquiry dated September 13, 2013, an agent for D & D called DWD, confirmed that the company had purchased two stores in 2010, and asked why the company's rate had increased significantly "just for taking on maybe 30" employees, and the DWD representative explained the timing of the acquisition and that D & D's rate had been recalculated and blended with the disposer's rate. *Id.* at 56.

[7] Bickley testified that she processed the acquisition involving D & D based on the report of transfer and that she had spoken with Katherine Chaffins of Chaffins regarding the acquisition. Bickley testified that Chaffins had been doing business as NAPA North Judson and had an address on Talmer Avenue, that D & D was also an auto parts store with the same address on Talmer Avenue, and that D & D used the same telephone numbers used by Chaffins.

[8] Bottoms testified that she reviewed wage detail reports and found that two employees who had worked for Chaffins, Kenneth Reed and Brad Chaffins, later worked for D & D. Bottoms testified there was a gap in employment of the employees and that, even where there is a gap between when employees stop working for a disposer and start with an acquirer, the transfer of the employees could indicate that there was a transfer of business. She stated that the DWD looks at employee movement once it receives notification there has

been a sale, and that a lot of businesses will tell the DWD that the employees were let go and after that the other entity interviewed and rehired them, but that was still considered a transfer of an employee.

[9]     Chappell testified that one of her responsibilities, when an employer protests a determination of successorship, is to review the records and make a judgment call regarding whether the agency's determination was correct based on the best information available under the statute. She testified that D & D did not dispute that there was a transfer of assets and that it had hired employees of Chaffins, that D & D purchased those assets and hired the employees "to operate the same business in the same location under the same DBA that the former entity had used," that "both of these are considered Napa," that Chaffins used "Napa North Judson Roger's Precision Auto Supply," and that D & D "is Napa North Judson." Transcript at 34. She stated that Chaffins reported that it completely ceased its operation, and that she checks the internet to "see whether or not you can get from one business, the old business to the new business seamlessly. So that there is an appearance of continuation for what's offered to the public." *Id.*

[10]    Chappell further testified that an acquisition may or may not have an impact on the acquiring company and that a company may acquire a business with a lower experience balance, a higher experience balance, or the same experience balance. She stated the notice and demand statements are based on an employer's own reporting of their taxable wages multiplied by the merit rate notice issued by the DWD, that the purchase of remaining assets after a

business closes can affect the DWD's determination in certain circumstances, including the nature and length of time of closure and other factors, and that the DWD looks at public records and determines, for intent and purpose, whether the new entity is a different business or essentially a continuation of all or part of the pre-existing business. She testified that in this case Chaffins stated it was in operation at the time of the acquisition, that D & D leased the building that Chaffins was in and took over its operations, and that in searching online for Roger's Precision Auto Supply she was directed to NAPA at North Judson which appeared to be the business being operated by D & D.

[11]     Additionally, Chappell testified that she could not "find anything in any of the filings or in the public record that shows that the business, which used [to] be Chaffins [], Napa North Judson, Roger's Precision Auto Supply, is not in actuality functioning under that same identity at this time with or without the same employee. If the identity continues, the business continues, there's a continuation of trade or business, the statute is satisfied. There should be a successorship by the agency and the experience balance should follow the business from one owner to the other owner." *Id.* at 47. Chappell also testified that the determination of successorship is not predicated on a transfer of the workforce and that the determination is whether the business trade or organization was continued in part or in whole and whether it is essentially the same business being operated regardless of whether it was operated with the same employees. She noted that the DWD used the case of *Indianapolis Concrete, Inc. v. Unemployment Ins. Appeals of Indiana Dep't of Workforce Dev.*, 900

N.E.2d 48 (Ind. Ct. App. 2009), in training its audit examiners, and stated that "everything I looked at showed that the business operated seamlessly between these two [entities]. That is a Napa location before. It was a Napa location after, and it never ceased to be a Napa location." *Id.* at 69.

[12] Dittrich testified that he was the president of D & D, he had personal knowledge that the amounts on the bill of sale were accurate for the value of the inventory of Chaffins, and that he did not purchase any right to hire employees or use a phone number through the bill of sale. He testified that D & D hired employees who were formerly employed by Chaffins and, when asked how he came to hire those employees, that the company had applications that anybody who wished could complete. He stated that he purchased the inventory of NAPA North Judson and that he then leased the building on Talmer Avenue from the Chaffins family. When asked if there were any other businesses operating on the property, Dittrich testified: "Yes, Roger's Precision Auto Supply, which was a rebuilding shop or a [] service center for rebuilding motors, [] those types of things." *Id.* at 75. He indicated he did not purchase a corporate name, any covenant not to compete, any goodwill, any patent rights, any accounts receivable, or any books and accounts from Chaffins.

[13] Dittrich was asked the business of D & D NAPA, Inc., and D & D Metal Products, Inc., and he replied that each were in the business of selling auto parts. When asked the business activity of Chaffins, Dittrich testified that it "did engine repairs in their Roger's Precision Auto in the back" and "had a very small parts store up in the front, and his, most of his business was rebuilding

motors." *Id.* at 76. Dittrich was asked "[s]o the auto part store in the front, was that, is that the Napa North Judson," and Dittrich testified "Yes. You can't operate a store with $20,000 of inventory" and that "[y]ou wouldn't have customers." *Id.* He testified Chaffins was "running an engine rebuilding center there" and "had blades and different things to rebuild motors" and that "[t]his was just like a little counter in the front of there . . . ." *Id.* He stated that he thought the business was still at that location even though D & D had moved. When asked if D & D "had the business name Napa North Judson," Dittrich replied "we answer the phone Napa North Judson." *Id.* at 77. When asked the reason, Dittrich testified that there are six thousand NAPA dealers, and that "what happens is, Napa, when they have a customer that's not doing well or is gonna close, they go out and find somebody to kept [sic] that territory open" and "[s]o they came to me said look we have this opportunity in North Judson we'd like you to look at." *Id.* Dittrich testified D & D was not a franchisee but that it bought NAPA parts, that it used the NAPA name, and that it sold only auto parts and only NAPA auto parts. When asked if he had another location besides the North Judson location, Dittrich testified "[w]e have eleven in Illinois and five in Indiana" and that they were all NAPA stores. *Id.* at 78.

[14] On cross-examination, when asked if D & D had purchased furniture and fixtures from Chaffins, Dittrich testified: "(inaudible) where you purchase the racking that the stuff sits on, the counter, the computers. That would be what we considered that $17,000 number. The gondulas [sic] in the front of the store where you put your oil and your car wash stuff." *Id.* at 79. When asked about

the October 15, 2013 letter referencing that $200,000 of assets were purchased, he said "[t]hat's because of the amount of auto parts that we needed to put in the store before we opened it." *Id.* Dittrich further testified that, at the time he looked at the business, there were no employees other than Roger's wife, the company provided applications for any public person to fill out, they interviewed and hired Roger's son and another person, and that D & D was not still leasing the building from Chaffins because it moved to a bigger and better location.

[15] When asked if, when he first operated the store on Talmer Avenue, he used the same signage as Chaffins, Dittrich indicated it was a NAPA brand logo and that he did not change the sign. He said that the website was maintained by NAPA Corporate in Atlanta, Georgia, that the website flags any store that uses the NAPA name, and that D & D has nothing to do with and does not pay for the website. He indicated that D & D did not have a store-specific website, NAPA territories are not protected, and that how many NAPA stores are in an area depends on the population. When asked what specifically D & D was protesting, Dittrich testified "I'm protesting the rate. . . . I mean, for a $37,000 investment to go through what I'm doing today? No way. I wouldn't even had attempted to do it. I don't need it. . . . I bought his assets, not his liabilities and had I known that this was hanging out there, I would not have moved forward with it." *Id.* at 84.

[16] In closing, the DWD's counsel asked the ALJ to find that D & D was a successor employer under Ind. Code § 22-4-10-6 or, in the alternative, that D &

D did at least acquire a distinct and segregable portion of the organization under Ind. Code § 22-4-10-6(b). D & D asked the ALJ to overturn the determination that was made by the DWD.

[17] On January 5, 2015, the ALJ issued a Decision of Liability concluding that D & D acquired Chaffins's auto parts retail business only and became a successor employer pursuant to Ind. Code § 22-4-10-6(b). The ALJ's decision provides in part:

> The . . . issue involved in this case is whether [D & D] made a complete acquisition and became a successor employer to Chaffins. In cases of disposition/acquisition, the [DWD] is bound by specific statutes, which establish whether a disposition/acquisition results in a successorship. In applying those statutes, if the [DWD] determines that a successorship transfer exists, a successor employer's liabilities, experience balance, and contribution rate is to be determined based upon the applicable statutory provisions. . . .
>
> * * * * *
>
> In this case, [D & D] and Chaffins were registered employers with the [DWD] at the time of the transfer of assets at issue. Both entities were engaged in the automotive parts retail business. [D & D] acquired Chaffins' stock-in-trade, merchandise, inventory, furniture, fixtures, and miscellaneous equipment used in Chaffins' store. [] [D & D] took possession of Chaffins' business location and Chaffins' NAPA signage and phone numbers. [D & D] also hired two employees that once worked for Chaffins. [D & D] used all of those things to operate its automotive parts retail business. Accordingly, the [ALJ] concludes that [D & D] acquired Chaffins' auto parts retail organization, trade, or business.
>
> Nevertheless, [D & D] provided testimony that Chaffins also had a service center in the back of the store. On the Report of Transfer Form, Ms. Chaffins marked that the sale was an "other" transaction, instead of a sale of the complete organization. Ms. Chaffins also wrote an explanation of the "other" designation on the form as a "lease of

building" and "purchase of retail business." [] Moreover, the [ALJ] notes that Ms. Chaffins reported the effective date of the transfer from Chaffins to [D & D] as April 23, 2010 but submitted a Report of Inactivation form stating the Chaffins discontinued operations and issued its last payroll on September 30, 2011.

Accordingly, the [ALJ] concludes that [D & D] made a partial acquisition of Chaffins' business. Specifically, [D & D] acquired Chaffins' retail business only. [D & D] did not acquire the service center portion of Chaffins' business. Based on the foregoing conclusions, the statutes and rules relating to partial transfers / successorships and employer contribution rates, under Indiana unemployment law, are applicable to the transfer at issue. The [DWD's] successorship determination is MODIFIED in favor of [D & D] and the resulting assessment of contributions, penalty and interest must be recalculated.

Exhibits at 94. D & D now seeks review of the decision of the ALJ.

## *Discussion*

[18] The issue is whether the conclusion of the ALJ that D & D is a partial successor of Chaffins under Ind. Code § 22-4-10-6 is correct as a matter of law. The DWD did not file an appellee's brief. When an appellee fails to submit a brief, we do not undertake the burden of developing its arguments, and we apply a less stringent standard of review, that is, we may reverse if the appellant establishes *prima facie* error. *Zoller v. Zoller*, 858 N.E.2d 124, 126 (Ind. Ct. App. 2006). This rule was established so that we might be relieved of the burden of controverting the arguments advanced in favor of reversal where that burden properly rests with the appellee. *Wright v. Wright*, 782 N.E.2d 363, 366 (Ind. Ct. App. 2002). Questions of law are still reviewed *de novo*. *McClure v. Cooper*, 893 N.E.2d 337, 339 (Ind. Ct. App. 2008).

[19]     Under Ind. Code § 22-4-32-9, "[a]ny decision of the liability administrative law judge shall be conclusive and binding as to all questions of fact." The decision of the liability administrative law judge may be appealed "solely for errors of law under the same terms and conditions as govern appeals in ordinary civil court." *Franklin Elec. Co. v. Unemployment Ins. Appeals of Ind. Dep't of Workforce Dev.*, 953 N.E.2d 1066, 1069 (Ind. 2011). The liability administrative law judge's legal conclusions are not entitled to the same deference. *Id.*

[20]     D & D maintains the ALJ's determination that it was a successor of Chaffins was improper and argues that it did not purchase substantially all of the assets of Chaffins and that its experience rating should be recalculated to reflect this incorrect determination. D & D contends that the facts in this case follow closely those of *Indianapolis Concrete*, in that it did not acquire any corporate name, goodwill, work in progress, patent rights, licenses, trademarks, trade names, technical data, or book of accounts from Chaffins, and that in fact D & D acquired even less assets than in *Indianapolis Concrete* because it did not acquire any of Chaffins's customers.

[21]     D & D further contends that the primary business of Chaffins was the auto repair shop, that D & D did not and does not provide any auto repair services, and that its business is solely the sale of automobile parts. It states that "[t]he only asset purchase from Chaffins which benefits this business is the purchase of inventory constituting only approximately 20% of the inventory necessary for D & D to conduct its business," that "[a]ll other inventory was purchased from other suppliers so that D & D could conduct its business," and that "[a]s a

primary auto parts store, the assets purchased from Chaffins were utterly insufficient to conduct D & D's chosen business." Appellee's Brief at 4. D & D argues that, in applying the definition used by the court in *Indianapolis Concrete*, it is not a successor employer.

[22] Unemployment insurance in Indiana is financed by a tax on Indiana employers. *Franklin Elec.*, 953 N.E.2d at 1069. Employer contributions are charged proportionally against an employer's experience account. *Id.* (citing Ind. Code § 22-4-11-1(a)). As a result, the more unemployment claims that are filed against an employer, the more that employer must contribute to the unemployment fund. *Id.*

[23] Each year, the Department of Workforce Development determines the contribution rate applicable to each employer, and the contribution is then credited to an "experience account" established for each employer by the Department. *UTLX Mfg., Inc. v. Unemployment Ins. Appeals of Ind. Dep't of Workforce Dev.*, 906 N.E.2d 889, 892 (Ind. Ct. App. 2009) (citing Ind. Code § 22-4-11-2(a), (e)). An employer's experience account is charged when a qualifying employee receives unemployment benefits based upon unemployment with that employer. *Id.* The experience account contribution rate for an employer is determined, in part, by the balance in its experience account. *Id.* Therefore, when a company's employees file more unemployment claims, its contribution rate will also increase. *Id.*

In the event of a sale of a company, the DWD is responsible for determining the successorship status of an acquiring employer when either a total or partial acquisition occurs between employers. *Id.* (citing *Indianapolis Concrete*, 900 N.E.2d at 50). A successor employer assumes the resources and liabilities of the experience account of the predecessor employer with respect to that portion of the organization, trade or business acquired. *Id.* The successor employer's contribution rate is then adjusted based upon the new balance in its experience account. *Id.* If an acquiring employer is denied successor employer status, its experience account balance does not change after the acquisition and the employer's contribution rate is calculated based upon that unchanged balance. *Id.*

An "Employer" in Indiana's unemployment compensation system includes any "employing unit" which acquires the organization, trade, or business of another employer and any employing unit which "acquires substantially all the assets within this state of such an employer used in or in connection with the operation of such trade or business," Ind. Code § 22-4-7-2(a), as well as any employing unit which "acquires a distinct and segregable portion of the organization, trade, or business within this state of another employing unit . . . ." Ind. Code § 22-4-7-2(b).

Ind. Code § 22-4-10-6 governs successor employers, and subsection (a) of the statute applies in part where there is an acquisition of substantially all the assets of another employer and provides in part:

when:

> > (1) an employing unit (whether or not an employing unit at the time of the acquisition) becomes an employer under IC 22-4-7-2(a);
>
> > (2) an employer acquires the organization, trade, or business, or substantially all the assets of another employer; or
>
> > (3) an employer transfers all or a portion of the employer's trade or business (including the employer's workforce) to another employer as described in IC 22-4-11.5-7;
>
> the successor employer shall, in accordance with the rules prescribed by the department, assume the position of the predecessor with respect to all the resources and liabilities of the predecessor's experience account.

[27]  Subsection (b) of Ind. Code § 22-4-10-6 applies in part where there is an acquisition of a "distinct and segregable portion" of the business of another employer and provides in part:

> when:

> > (1) an employing unit (whether or not an employing unit at the time of the acquisition) becomes an employer under IC 22-4-7-2(b); or
>
> > (2) an employer acquires a distinct and segregable portion of the organization, trade, or business within this state of another employer;
>
> the successor employer shall assume the position of the predecessor employer with respect to the portion of the resources and liabilities of the predecessor's experience account as pertains to the distinct and segregable portion of the predecessor's organization, trade, or business acquired by the successor. . . . This portion of the resources and liabilities of the disposing employer's experience account shall be transferred in accordance with IC 22-4-11.5.

[28] Ind. Code §§ 22-4-11.5 relates to assignment of employer contribution rates and transfers of employer experience accounts, and Ind. Code § 22-4-11.5-7 provides in part:

> (a) This section applies to a transfer of a trade or business that meets the following requirements:
>> (1) An employer transfers all or a portion of the employer's trade or business to another employer.
>> (2) At the time of the transfer, the two (2) employers have substantially common ownership, management, or control.
> (b) The successor employer shall assume the experience account balance of the predecessor employer for the resources and liabilities of the predecessor employer's experience account that are attributable to the transfer.
> (c) The contribution rates of both employers shall be recalculated, and the recalculated rate made effective on the effective date of the transfer described in subsection (a). . . .

[29] In *Astral Indus., Inc. v. Ind. Emp. Sec. Bd.*, the court noted that the word "substantially" in referring to a predecessor's assets does not "indicate a definite, fixed amount of percentage but is an elastic term which must be construed according to the facts of the particular case" and that "a prime question in determining whether substantially all of the assets of the organization or the trade or business was taken over is: Did the acquisition result in a substantial continuation of the same or a like business?" 419 N.E.2d 192, 197 (Ind. Ct. App. 1981) (citation omitted).

[30] In *Ashlin Transp. Servs., Inc. v. Ind. Unemployment Ins. Bd.*, the court addressed the meaning of "distinct and segregable" as used in Ind. Code § 22-4-10-6(b) and noted that employees are assets, at least in a practical business sense, and

that when a company acquires employees it may acquire a distinct and segregable portion of the organization, trade, or business of another employer. 637 N.E.2d 162, 167 (Ind. Ct. App. 1994).

[31] In *Indianapolis Concrete*, the court observed that, in determining whether one employer has acquired substantially all of the assets of another under Ind. Code § 22-4-10-6(a), courts have considered several factors, including acquisition of manufacturing equipment and machinery, office equipment, corporate name, inventories, covenants not to compete, possession of premises, goodwill, work in progress, patent rights, licenses, trademarks, trade names, technical data, lists of customers, sales correspondence, books of accounts, and employees transferred. 900 N.E.2d at 51. The court noted that Indianapolis Concrete had hired a number of another employer's former employees, acquired two of the other business's clients, and acquired certain assets of the other business including its phone number, two trucks, and other equipment. *Id.* at 52. The court also observed, however, that the owner of Indianapolis Concrete supplied his own equipment and leased further equipment as well as ten vehicles, that the work of Indianapolis Concrete was more diverse than the other business's work, that the other business had no ongoing projects, and that Indianapolis Concrete did not acquire the other business's premises, office equipment, computers, bank accounts, or goodwill. *Id.* The court concluded that, in light of the factors discussed, Indianapolis Concrete did not acquire substantially all of the assets of the other company but rather acquired assets from which it built a new business. *Id.*

[32] In *UTLX Mfg.*, Union Tank restructured its business into three units, namely, leasing, manufacturing, and repair, and later UTLX became responsible for Union Tank's manufacturing unit. 906 N.E.2d at 893. Union Tank transferred its manufacturing assets, including machinery, equipment, rail trackage, real estate, and inventory, as well as hundreds of employees, to UTLX. *Id.* at 890-893. The DWD initially determined that UTLX acquired a portion of Union Tank's business but later determined, after tracking UTLX's wage reports, that the transfer between the disposer and the employer had been a total transfer, not a partial transfer, and therefore constituted a full successorship. *Id.* at 891. On appeal, UTLX argued there had not been a total transfer instead of a partial sale. *Id.* The court concluded that UTLX had become an employer to a distinct and segregable portion of Union Tank and then also went on to hold, based on the hundreds of wage records showing that virtually all of Union Tank's employees in its Indiana manufacturing unit were transferred to UTLX in addition to machinery, rail trackage, and some buildings and inventory, that UTLX had acquired substantially all of its predecessor's assets. *Id.* at 893-894.

[33] In this case, the ALJ concluded that D & D acquired Chaffins's auto parts retail business only and became a successor employer as to that particular portion of Chaffins's business. We thus do not examine whether D & D acquired the service center portion of Chaffins's predecessor business, such as its business of repairing engines and rebuilding motors, or the assets attributable to the service center aspect of Chaffins's business.

[34]    We turn to whether there was a transfer of a portion or distinct and segregable portion of Chaffins's trade or business, namely, its auto parts sales business, to D & D, and in doing so we consider the factors, to the extent they are applicable, identified in *Indianapolis Concrete* and the opinions above. We also note that a number of the factors set forth in *Indianapolis Concrete* are not applicable or do not tend to favor a finding that D & D did or did not acquire a portion of Chaffins's business. In particular, the parties did not present evidence that Chaffins possessed any patent rights, trademarks, technical data, covenants not to compete, or work in progress and thus the fact D & D may not have acquired assets in these categories is not significant.

[35]    While there is no indication that D & D acquired from Chaffins any particular customers or lists of customers, sales correspondence, or books of accounts, and the bill of sale, in referring solely to inventory and furniture, reveals that D & D did not acquire any goodwill from Chaffins, the evidence establishes that D & D did acquire other assets.

[36]    D & D does not dispute that it acquired the inventories, certain office equipment, and shelving of Chaffins related to the auto parts sales business. According to the bill of sale, D & D purchased all of Chaffins's stock-in-trade, merchandise, and inventories for $20,798.29 and the furniture, fixtures, and miscellaneous equipment used in Chaffins's store for $17,279. While the purchase of all of Chaffins's NAPA inventory may or may not have been adequate to fully stock D & D's NAPA business, D & D did purchase all of Chaffins's inventory. Further, Dittrich testified that D & D purchased Chaffin's

store racking, computers, and gondola shelving. Moreover, both Chaffins, in the front area of the building on Talmer Avenue, and D & D, after it leased the same building, were engaged in the business of selling automotive parts to retail customers.[7] In its Report of Transfer form filed with the DWD, Chaffins indicated that there had been a purchase of its retail business and that it had ceased operations.

[37] With respect to the store's premises and location, the evidence establishes that D & D initially leased the building on Talmer Avenue from the Chaffins family and that it used the same signage of a NAPA brand logo as Chaffins. Dittrich testified that D & D used the NAPA name and sold only NAPA auto parts. While D & D may have relocated its store to a bigger and better location for the business than before the move, D & D continued to engage in the business of selling NAPA automotive parts to retail customers and both D & D's initial and new locations were NAPA retail stores in North Judson. D & D used the same telephone number used by Chaffins. In short, D & D took possession of Chaffins's auto parts inventory, computers, racking, shelving, business location, NAPA signage, and phone number.

[38] The DWD's wage detail reports indicate that two employees who had worked for Chaffins later worked for D & D. Bottoms testified there was a gap in the

---

[7] While the evidence does not indicate that D & D leased the same area of the building on Talmer Avenue used by Chaffins to sell auto parts, Dittrich testified that Chaffins may still operate its business from the location, indicating Chaffins did not vacate the back area of the building or cease its service center business with the sale and lease to D & D.

employment of the employees but that the DWD still considered the employee movement, "especially if it's a similar business." Transcript at 25.

[39] As to the name of the business, while D & D did not acquire Chaffins's legal corporate name, and Dittrich testified that D & D is not a franchisee and NAPA does not use territories, the evidence establishes that Chaffins used the NAPA name prior to the sale and D & D used the NAPA name after the sale. Further, Chaffins's business was named "Napa North Judson Roger's Precision Auto Supply," and when answering the phone D & D's employees identified the store as NAPA North Judson. *Id.* at 34.

[40] Chappell testified that D & D purchased Chaffins's assets and hired the employees "to operate the same business in the same location under the same DBA that the former entity had used." *Id.* at 34. She also testified that "the business operated seamlessly between" Chaffins and D & D, that the store was a Napa store before and after the sale, and that "it never ceased to be a Napa location." *Id.* at 69. Dittrich testified that NAPA presented the opportunity in North Judson to him and that he had five NAPA locations in Indiana and eleven in Illinois.

[41] Based upon the record and the considerations discussed above, we conclude that the ALJ did not err in concluding that D & D acquired Chaffins's NAPA retail auto parts sales business and did not acquire the service center portion of Chaffins's business and thus that D & D made a partial acquisition of Chaffins's business.

## *Conclusion*

[42] For the foregoing reasons, we affirm the decision of the ALJ.

[43] Affirmed.


Riley, J., and Altice, J., concur.